No. 23-3125

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

JEFFERY P. RHOADS, M.D.,

Plaintiff-Appellant,

vs.

STORMONT-VAIL HEALTHCARE, INC.,

Defendant-Appellee

_____

Appeal from the United States District Court
for the District of Kansas

The Honorable John W. Brooms
District Court No. 22-4005-JWB

_____

APPELLANT'S OPENING BRIEF

_____

ALAN V. JOHNSON, KS. #9992                    ORAL ARGUMENT
SLOAN, EISENBARTH, GLASSMAN,                  NOT REQUESTED
  McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
TOPEKA, KS  66603
PHONE:     785/357-6311
FAX:       785/357-0152
ATTORNEY FOR APPELLANT

## TABLE OF CONTENTS

**STATEMENT OF JURISDICTION** ...................................................1

**STATEMENT OF ISSUES** ...........................................................2

**STATEMENT OF THE CASE** .......................................................2

    **A.**    **Dr. Rhoads' Employment Relationship
           With Stormont Vail** ...............................................2

    **B.**    **The Precautionary Restriction of Dr. Rhoads'
           Medical Staff Privileges** ..........................................4

    **C.**    **Dr. Rhoads' Initial Evaluation By
           Acumen Assessments, Inc.** .......................................6

    **D.**    **Dr. Rhoads' Voluntary Leave of Absence
           From Stormont's Medical Staff** ................................7

    **E.**    **Dr. Rhoads' Evaluation By The
           University of Kansas** ...............................................7

    **F.**    **Dr. Rhoads' Final Evaluation By Acumen** ...............9

    **G.**    **Dr. Townley's Recommendation That
           Dr. Rhoads Return to Work To
           Outpatient Medicine with Oversight** ....................10

    **H.**    **Dr. Rhoads' Interactive Process
           With Dr. Dishman** ..................................................14

    **I.**    **The Interactive Process Between
           The Parties' Attorneys** ..........................................17

    **J.**    **The Status of Dr. Rhoads' Medical
           Staff Privileges** ....................................................20

    **K.**    **The KHRC Mediation on
           September 15, 2021** ...............................................22

    **L.**    **The Termination of Dr. Rhoads'
           Employment** ........................................................25

**M.**    **Proceedings In The District Court** ........................................ 26

**ARGUMENTS AND AUTHORITIES** ........................................................... 26

Sanderson  v.  Wyo. Highway  Patrol,
976 F.3d 1131, 1173 (10th Cir. 2020) ............................................... 26

Gullickson v. Southwest Airlines Pilots' Ass'n,
87 F.3d 1176, 1183 (10th  Cir. 1996). ............................................... 27

Aubrey v. Koppes,
975 F.3d 995, 1004 (10th Cir. 2020). ................................................ 27

Water Pik, Inc. v. Med-Sys., Inc.,
726 F.3d 1136, 1143 (10th Cir. 2013). ............................................. 27

Reeves v. Sanderson Plumbing Prod., Inc.,
530 U.S. 133, 150 (2000). .................................................................. 27

Jefferies v. State of Kansas,
147 F.3d 1220, 1228 (10th Cir. 1998). ............................................. 27

**I.**    **A REASONABLE JURY, FACED WITH THE EVIDENCE**
**PRESENTED, COULD RETURN A VERDICT IN FAVOR**
**OF DR. RHOADS ON HIS**
**FAILURE-TO-ACCOMMODATE CLAIM** ........................................ 27

Sullivan v. Univ. of Kansas Hosp. Auth.,
844 Appx. 43, 48 (10th Cir. 2021). ................................................... 27

Fitzgerald v. Corr. Corp. of Am.,
403 F.3d 1134, 1144 (10th Cir. 2005). ............................................. 27

**A.**    **The Summary Judgment Framework**
**For Analyzing Dr. Rhoads' Failure-To-**
**Accommodate Claim** ............................................................. 28

McDonnell Douglas Corp. v. Green.,
411 U.S. 792 (1973). ......................................................................... 28

Punt v. Kelly Servs.,
862 F.3d 1040, 1050 (10th Cir. 2017) .............................................. 28

Smith v. Midland Brake, Inc.,
180 F.3d 1154 (10th Cor. 1999) ...................................................... 28

Herrman v. Salt Lake City Corp.,
21 F.4th 666, 674 (10th Cir. 2021) ................................................... 29

Smith,
180 F.3d at 1172 ............................................................................. 29

Herrmann,
21 F.4th at 674-75 ........................................................................... 30

Smith,
180 F.3d at 1179 ............................................................................. 30

**B.      A Reasonable Jury Could Find That Dr. Rhoads
         Has Established A Prima Facie Case Regarding His
         Request For Reassignment To A Position Providing
         Outpatient Care** ...................................................... 30

**(1.)    A Reasonable Jury Could Find That Dr. Rhoads
         Was Qualified, With Accommodation, To Perform
         The Duties of An Outpatient Physician** .............................. 30

Osborne v. Baxter Healthcare Corp.,
798 F.3d 1260, 1268-69 (10th Cir. 2015) ........................................ 30

U.S. Airways v. Barnett,
535 U.S. 391, 402 (2002) ................................................................ 30

Jarvis v. Potter,
500 F.3d 1113 (10th Cir. 2007) ....................................................... 31

Osborne,
798 F.3d at 1269. ........................................................................... 31

**(2.)    A Reasonable Jury Could Find That Dr. Rhoads
         Suffered An Injury** ................................................................. 34

**C.      A Disputed Issue Of Fact Exists As To Stormont's
         Affirmative Defense Regarding Dr. Rhoads' Request
         For Reassignment To A Position Providing
         Outpatient Care** ...................................................... 35

Herrmann,
674… .......................................................................................... 35

Osborne,
798 F.3d at 1267-68, n.9. ........................................................... 35

D.    A Reasonable Jury Could Find That Dr. Rhoads has
established A Prima Facie Case Regarding His Request
For Reassignment To An Administrative Position
Not Requiring Direct Patient Care  ...................................... 38

(1.)   A Reasonable Jury Could Find That Dr. Rhoads
Did Not Abandon His Request For Reassignment
To An Administrative Position During The
Interactive Process ............................................... 38

(2.)   A Reasonable Jury Could Find That Dr. Rhoads
Was Qualified To Perform Multiple Administrative
Positions Which Were Available About The Time
He Made His Request For Reassignment ........................... 40

Herrmann,
21 F.4th at 675 ................................................................... 40

Aubrey v. Koppes,
975 F.3d 995 (10th Cir. 2020) ........................................ 42

Valdez v. McGill,
462 F. Appx., 814, 819 n.5 (10th Cir. 2012) ...................................... 42

(3.)   A Reasonable Jury Could Find That Dr. Rhoads
Suffered An Injury ................................................. 42

Herrmann,
21 F.4th 666, 675. .......................................................... 43

**CONCLUSION** ........................................................................... 43

**CERTIFICATE OF COMPLIANCE WITH RULE 32** ................................... 43

**CERTIFICATE OF DIGITAL SUBMISSION** ............................................. 43

**ORAL ARGUMENT** ......................................................................... 44

**CERTIFICATE OF SERVICE**................................................................... 45

**APPENDIX** ............................................................................................ 46

 **Attachment 1: District Court Memorandum and Order
 Filed June 09, 2023**........................................................................ 47

 **Attachment 2: District Court Judgment
 Filed June 9, 2023**.......................................................................... 70

## <u>PRIOR APPEALS</u>

There are no prior or related appeals to this action.

## **STATEMENT OF JURISDICTION**

This is an employment discrimination case arising under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, <u>et seq</u>. and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701, <u>et seq</u>. The plaintiff, Dr. Jeffrey P. Rhoads, M.D., was employed for over ten years as a Hospitalist by the defendant, Stormont Vail Healthcare, Inc. ("Stormont"). In January of 2021, Dr. Rhoads was diagnosed with mild neurocognitive disorder. On September 15, 2021, Dr. Rhoads and Stormont engaged in a mediation session as part of proceedings before the Kansas Human Rights Commission. At the end of this mediation session, Stormont terminated Dr. Rhoads' employment. (Aplt. App. at 1-21)

Dr. Rhoads then filed this lawsuit, asserting three claims under the ADA and the RA against Stormont: (1) failure to grant his requests for a reasonable accommodation; (2) retaliation against him for engaging in protected activity; and (3) termination of his employment because of his disability. In addition, pursuant to 28 U.S.C. § 1367, Dr. Rhoads also asserts a fourth claim against Stormont under Kansas common law for breach of his written employment contract. (Aplt. App. at 21-24)

Stormont filed a motion for summary judgment as to all four of Dr. Rhoads' claims. (Aplt. App. at 56) On June 9, 2023, the district court filed a memorandum and order, granting summary judgment in favor of Stormont on all four of Dr. Rhoads' claims. (Aplt. App. at 497-519) Also on June 9, 2023, the district court entered final judgment in favor of Stormont. (Aplt. App. at 520)

On July 7, 2023, Dr. Rhoad filled a notice of appeal pursuant to Fed. Rule App. Pro. 4 (a)(1). (Aplt. App. at 521) The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. This appeal only involves Dr. Rhoads' claim that Stormont failed to grant his requests for a reasonable accommodation.

## STATEMENT OF ISSUE

1.     Could a reasonable jury, faced with the evidence presented, return a verdict in favor of Dr. Rhoads on his failure-to-accommodate claim?

## STATEMENT OF THE CASE

The following facts are stated in the light most favorable to Dr. Rhoads, who opposed Stormont's motion for summary judgment.

### A.     Dr. Rhoads' Employment Relationship with Stormont Vail

Dr. Rhoads is a physician licensed by the State of Kansas who specializes in internal medicine. Stormont is a not-for-profit healthcare system located primarily in Topeka, Kansas. Stormont is an "employer" for purposes of the ADA, and a "program receiving Federal financial assistance" for purposes of Section 504 of the RA. Dr. Rhoads is also an "employee" for purposes of the ADA. (Aplt. App. at  41)

In April of 2011, Dr. Rhoads was hired by Stormont to provide health care services as a Hospitalist. This employment relationship was governed by a written contract, called an Established Physician Employment Agreement ("Employment Agreement"), which was revised periodically. (Aplt. App. at 10-11, 27)

The most recent version of this Employment Agreement has an effective date of October 1, 2019. (Aplt. App. at 91) The Employment Agreement states that "[t]he Term of this Agreement will begin on the Effective Date and will continue for an indefinite period until termination pursuant to Section 5.2 below." (Aplt. App. at 98) Section 5.2, in turn, states in relevant part: "SCH will explore all reasonable accommodations including possible reassignment, for a Physician with a disability". (Aplt. App. at 100)

Stormont employs both inpatient physicians (such as Hospitalists) and outpatient physicians. The essential functions and duties of inpatient and outpatient physicians include the ability to provide medical care to patients that meets the appropriate standard of care, independently exercise professional judgment regarding the care and treatment of patients, create and recommend appropriate and specific treatment plans, accurately record a patient's medical history, accurately update patient information and chart with sufficient detail, lead and coordinate care for patients, and perform administrative tasks. (Aplt. App. at 114-115)

Pursuant to his Employment Agreement, Dr. Rhoads was typically scheduled to work 7 shifts on duty at Stormont Vail Hospital, followed by 7 shifts off duty. A shift is defined in the Employment Agreement as greater than 8 hours and less than 14 hours. (Aplt. App. at 11, 28)

During the spring and summer of 2020, Dr. Rhoads treated a number of patients with COVID-19. In October of 2020, Dr. Rhoads himself tested positive

for COVID-19, and he was hospitalized at Stormont Vail Hospital. Following his hospitalization, Dr. Rhoads returned to work. (Aplt. App. at 11, 28) His last shift as a Hospitalist at Stormont Vail Hospital was November 24, 2020. (Aplt. App. at 41)

Prior to November of 2020, there were no formal complaints by any of the physicians at Stormont about the care which Dr. Rhoads was providing to his patients. In addition, there were never any formal complaints by patients about the care which Dr. Rhoads had provided to them. (Aplt. App. at 471-472)

### B. The Precautionary Restriction of Dr. Rhoads' Medical Staff Privileges

Stormont's Medical Staff has the duties of peer review, credentialing, quality and patient safety. All physicians, whether employed by Stormont or not, must be granted privileges to practice medicine at Stormont, in accordance with the Medical Staff's Credentials Policy. (Aplt. App. at 201, 219-220)

During the time period relevant to this lawsuit. Dr. Kimberly Brey was the President of Stormont's Medical Staff. (Aplt. App. at 200) During the same time period, Dr. Traci Cuevas and Dr. Jason Austin were co-medical directors of the adult Hospitalist group. (Aplt. App. at 228)

On November 9, 2020, Dr. Brey received a telephone call from Dr. Cuevas regarding concerns about Dr. Rhoads. (Aplt. App. at 204-205) Dr. Brey's notes of this telephone conversation state in relevant part:

> [Dr. Cuevas] reports that she is aware of a longstanding concern about recurrent documentation issue with one

> of the hospitalists…. She does feel that this has been a decline over time and <u>there is no immediate concern to patient care</u>. They did not believe that he needed to be removed from his position at this time, emergently. Discussed next step is to set up a subcommittee of the Medical Executive committee and discuss. Discussed next step is to set up a subcommittee of the Medical Executive Committee and discuss.

(Aplt. App. at 231. Emphasis added.)

As a result of her conversation with Dr. Cuevas, Dr. Brey formed an ad hoc Physician Health and Advocacy ("PHA") Subcommittee. The members of the PHA Subcommittee were Dr. Brey, Dr. Cuevas, and Dr. Austin, plus Dr. John Chamberlain, Dr. Salah Najm, Dr. Clifton Jones, Dr. Kevin Dishman, and Karen Reed-Coffman, Stormont's Director of  Medical Staff Offices. (Aplt. App. at 231, 268-287) Dr. Dishman is Stormont's Senior Vice President, Chief Medical Officer, and Quality Officer. (Aplt. App. at 114)

On December 1, 2020, the PHA Subcommittee held a meeting to discuss concerns about Dr. Rhoads relating to patient care, quality of care, standard of care, and managing the patients to include documentation. (Aplt. App. at 231) According to Dr. Brey's notes, the Subcommittee made several recommendations, including the following:

> 1.   Quick action from medical Staff for discussion with physician, Dr. J Rhoads – meeting prior to his next shift which will be at 12/2/2020 at 7 – I have reached out and left a message to call and schedule this meeting.

     2.      Recommendations for <u>precautionary restriction of privileges</u> withholding shifts until the evaluation is completed and an initial report is received.

     3.      Recommendations for referral to Acumen for comprehensive evaluation of cognitive abilities or deficiencies, including possible neurological evaluation if indicated.

(Aplt. App. at 232. Emphasis added.)

**C.**    <u>**Dr. Rhoads' Initial Evaluation By Acumen Assessments, Inc.**</u>

Pursuant to the recommendations of the PHA Subcommittee, Dr. Rhoads scheduled an appointment for an evaluation by Acumen Assessments, Inc. ("Acumen"). However, he was not able to be seen until January 4, 2021. (Aplt. App. at 117, 232)

Dr. Rhoads' initial evaluation by Acumen was dated January 8, 2021, and it was signed by Dr. Peter Graham, Ph. D., who is the Co-Director of Acumen. (Aplt. App. at 126) The initial evaluation by Acumen diagnosed Dr. Rhoads with Mild Neurocognitive Disorder (Aplt. App. at 125), and it included the following conclusions and recommendations:

     1.      <u>Dr. Rhoads should seek out a neurological consultation</u> with either the Saint Luke's Marion Bloch Neuroscience Institute or the University of Kansas' Alzheimer Center for examination that includes a neuroimaging study. In our opinion, a PET scan and/or DaTScan is indicated. We would also recommend that the evaluation include a formal sleep study to determine specific recommendations around his use of his CPAP at this time.

     2.      Until the evaluation is complete, Dr. Rhoads should continue on leave of absence. He is not

6

considered fit to practice. Further determination is necessary, <u>including a proctor observed practice in performance (PIP) process to see if he can function in a less demanding medical/primary care role</u>, if the addition[al] neurological and neuropsychological evaluation findings indicate that this might be feasible.

(Aplt. App. at 126. Emphasis added.)

### D.     Dr. Rhoads' Voluntary Leave of Absence From Stormont's Medical Staff

Beginning on January 11, 2021, Dr. Rhoads was on leave under the Family and Medical Leave Act. On  January 12, 2021, Dr. Rhoads submitted a request to the Medical Staff for a 30-day leave of absence. This request was granted, pursuant to the Medical Staff by-laws and rules. (Aplt. App. at 41-42)

On February 3, 2021, Dr. Rhoads submitted a request to the Medical Staff for a leave of absence for up to one year for health reasons. Again, this request was granted, pursuant to the Medical Staff bylaws and rules. (Aplt. App. at 42)

Stormont paid Dr. Rhoads his full base salary until February 10, 2021. From February 11, 2021, until the end of Dr. Rhoads' FMLA leave, Stormont paid him 50% of his base salary. (Aplt. App. at 42)

### E.     Dr. Rhoads' Evaluation By The University of Kansas

As noted above, Acumen recommended that "Dr. Rhoads should seek out a neurological consultation with… the University of Kansas' Alzheimer Center for examination that includes a neuroimaging study." (Aplt. App. at 126) In compliance with Acumen's recommendation, on February 8, 2021, Dr. Rhoads was examined by his personal treating neurologist, Dr. Ryan Townley, M.D., of

the University of Kansas Health System. (Aplt. App. at 139-155) In his report of the results of this examination, Dr. Townley stated in relevant part:

> When I try to make diagnoses for neurodegenerative disease, it requires putting together a puzzle. When he and his wife deny any subjective symptoms of cognitive concerns, it makes it difficult to tie in the most important piece of the puzzle which is the clinical history of the patient. The next 2 important pieces are patterns of abnormalities on cognitive testing, and neuroimaging. A scan does not a diagnosis make. We discussed that if he responds well to the donepezil medicine, like I think he will, we may be in a position 3 months from now where they will question if his cognitive improvement is secondary to recovery from long-hauler COVID syndrome, or if it is because of the donepezil.

(Aplt. App. at 152) In addition, as part of Dr. Rhoads' care plan, Dr. Townley recommended that Dr. Rhoads "[r]epeat cognitive testing at KU", and that he "[r]eturn to clinic in 6 months with Lindsey Gillen." (Aplt. App. at 153)

On or about February 24, 2021, Dr. Rhoads signed a records release form, authorizing the KU Hospital to release all of his records to Stormont. A few days later, Dr. Rhoads advised Dr. Brey that he had linked his medical records at the KU Hospital to his medical records at Stormont, in order to allow Stormont to view his information from KU. (Aplt. App. at 460)

On February 26, 2021, Dr. Townley reviewed the neuropsychological tests of Dr. Rhoads performed by Dr. Parks, Ph.D., who is employed by KU. (Aplt. App. at 157-161) In his progress notes summarizing his review of these tests, Dr. Townley stated in relevant part:

> Can patients with mild cognitive impairment still work, even at high cognitive demanding jobs, <u>such as a physician? Yes.</u> I have a number of my patients with mild cognitive impairment still working, including a physician and a veterinarian. However, this is in the setting of them responding well to the above medication (donepezil) and <u>them taking a reduced workload with some accommodations</u> to allow for more time given the slower processing speed and executive function issues. He should not return to work full time and should see how things go over time. <u>His work should be transparent about any issues they are noticing and help as needed to support him</u> unless there are errors occurring that are not amendable to support/accommodations.

(Aplt. App. at 161. Emphasis added.)

### F.   Dr. Rhoads' Final Evaluation By Acumen

On April 12, 2021, Dr. Brey and Ms. Reed-Coffman had a telephone conversation with Dr. Graham. (Aplt. App. at 448) In her notes, Dr. Brey referred to this conversation, stating:

> … I personally spoke to Dr. Graham at Acumen after his final evaluation, Dr. Graham stated that <u>he considered his evaluation completed and no longer needed to see Dr. Rhoads.</u>

(Aplt. App. at 379-380. Emphasis added.)

On April 13, 2021, Dr. Graham emailed Acumen's final evaluation of Dr. Rhoads to Dr. Brey and Ms. Reed-Coffman. (Aplt. App. at 477-478) Acumen's final evaluation stated in relevant part:

> We have reviewed the results and recommendations from the evaluation at the University of Kansas performed on Dr. Rhoads by Drs. Townley (neurologist) and Parks (neuropsychologist) …. <u>Given the neurological diagnosis, we would  recommend that the</u>

> 'treating providers' who should offer an opinion at this
> time regarding Dr. Rhoads potential return to work, and
> any potential accommodations, oversight, and lessened
> workload/demand (in an outpatient setting), should be
> his treating neurologist and neuropsychologist …. Dr.
> Rhoads will need to be followed along by his neurologist
> and should meet with his neurologist to discuss return to
> work in a supervised outpatient clinical position where
> his documentation and clinical decision making can be
> reviewed by a physician colleague working in the same
> setting and he can be observed throughout the workday
> by a defined group of co-worker/nurses.

(Aplt. App. at 478. Emphasis added.)

### G.    Dr. Townley's Recommendation That Dr. Rhoads Return To Outpatient Medicine With Oversight

On April 14, 2021, Dr. Brey called Dr. Townley to discuss Dr. Rhoads'

potential return to work at Stormont. In his progress notes, Dr. Townley

summarized this conversation in relevant part as follows:

> As we discussed, the attention and encoding of
> information can be dramatically helped in Lewy body
> disease with donepezil and if he is responding well, a
> return to outpatient medicine with
> oversight/accommodations makes sense. Either
> working closely with a nurse/practitioner/PA and/or
> someone overseeing documentation/treatment plans to
> make sure he is performing well would be
> recommended.

(Aplt. App. at 479. Emphasis added.)

On May 10, 2021, Dr. Rhoads was examined by Lindsey Gillen, pursuant

to Dr. Townley's care plan for Dr. Rhoads. Ms. Gillen is an APRN-NP employed

by KU. (Aplt. App. at 333-339) Ms. Gillien's diagnosis of Dr. Rhoads stated in

relevant part:

> Though he continues to have some very mild motor symptoms, as previous evaluations at neuropsychology testing at this facility have stated, he does NOT meet the criteria for dementia, A key component  to the diagnosis of dementia syndrome. <u>Our recommendations is that he can return to work with an average workday of approx. 8 hrs. per day, no more than 5 days per week. A process of evaluation should be in place to follow and evaluate his work performance.</u>

(Aplt. App. at 338. Emphasis added.)

Dr. Rhoads testified in his deposition that he had an outpatient/primary care practice in Topeka for about 15 years. (Aplt. App. at 443) This outpatient practice was when Dr. Rhoads was employed by the Cotton O'Neil Clinic, which is owned by Stormont. (Aplt. App. at 340) Dr. Rhoads was asked in his deposition how he understood Dr. Townley's recommendation that he be allowed to "return to outpatient medicine with oversight/accommodations." (Aplt. App. at 443-444) He explained:

> You basically want to put somebody almost in a buddy-like system with the person involved. I've gone the opposite direction of being the mentor or proctor for … numerous PAs and numerous mid-level providers. And we see patients together. We may not do the vital signs on the patient, but we do everything short of that. We will see everything, everybody together. Any part that I have that I'm missing the other person will have caught. You want to pick a partner that will compliment with you well. And basically if it works out the way it should, <u>you technically can grind through more patients in one day doing it this way than if you have just one provider trying to do everything.</u>

(Aplt. App. at 443-444. Emphasis added.)

11

Dr. Rhoads further testified that when he worked together with other practitioners when providing outpatient care in the Cotton O'Neil clinic, the other practitioners were also able to bill out their time. (Aplt. App. at 444)

Dr. Rhoads further testified how he understood Acumen's recommendation that he be allowed to "return to work in a supervised outpatient clinical position where his documentation and clinical decision making can be reviewed by a physician colleague working in the same setting." (Aplt. App. at 478) He explained:

> I understood Acumen's recommendation to mean that Stormont's proctoring process would be reinitiated. I am very familiar with Stormont's proctoring process. I participated in the proctoring process when I was first granted privileges at Stormont. I also participated in the proctoring process multiple times as the reviewing or proctoring physician.

(Aplt. App. at 461)

Dr. Brey testified that when a physician is first granted privileges as a member of Stormont's Medical Staff, the physician goes through a proctoring process, which can last up to a one year. (Aplt. App. at 467-468) Dr. Brey described the proctoring process as follows:

> [T]here is a defined number of cases that any other physician that has active privileges has to review or be present for depending on the type of case. And in that instance once the proctoring is done then they are fully completed and privileged.

(Aplt. App. at 467-468)

Dr. Brey further testified that if a problem comes up regarding the medical services being provided by a physician with full privileges, the proctoring process may be reinitiated. Dr. Brey explained:

> If a current physician that already has full privileges, if a problem comes up, whether it be in peer review or a problem brought forward otherwise, one of the options to handle it is <u>to reinitiate a proctoring session</u>. It is called a Focus Physician Practice Evaluation or FPPE.

(Aplt. App. at 468. Emphasis added.)

Prior to becoming President of Stormont's Medical Staff, Dr. Brey served as the President-elect of the Medical Staff. During Dr. Brey's tenure as President-elect, the PHA Subcommittee reviewed a problem involving Dr. Baraban, who had undergone surgery, which led to a prolonged hospital stay. There were concerns that Dr. Baraban had suffered a stroke. During his hospital stay, Dr. Baraban took a leave of absence from Stormont's Medical Staff, and then submitted to an evaluation. After his evaluation, Dr. Baraban returned to work at Stormont, and the proctoring process was reinitiated. (Aplt. App. at 469) Dr. Brey testified:

> Q.    And did Dr. Baraban return to work with no oversight after he finished his program?
>
> A.    Yes. After his review I actually do believe that we had proctoring, but I cannot recall 100 percent.

(Aplt. App. at 469. Emphasis added.)

### H.    Dr. Rhoads' Interactive Process with Dr. Dishman

Dr. Dishman is employed by Stormont as the Chief Medical Officer, and he is ultimately responsible for hiring physicians employed by Stormont in both its hospital and in its clinics. In his deposition, Dr. Dishman explained that Stormont's hospital provides in-patient services, and Stormont's clinics provide ambulatory or outpatient services. (Aplt. App. at 452-453) Dr. Dishman was the decision maker in this case regarding Dr. Rhoads' employment. (Aplt. App. at 291-292)

One April 26, 2021, Dr. Dishman sent an email to Dr. Rhoads, stating:

> Per our telephone conversation on April 15th I understand that the evaluations with Neurology and Accumen [sic] are now complete. I appreciate your openness in sharing this with us and will continue to work with you on completing the process of fit for duty assessment. As we discussed, the next step will be an evaluation by Dr. Soni Mathew, director of Occupational Health. He will be contacting you shortly to continue the process. Thank you again for your efforts to ensure that we continue to provide the highest quality of care as we work together to resolve this issue.

(Aplt. App. at 314)

On May 20, 2021, Dr. Mathew finally met with Dr. Rhoads, and also prepared a written progress note and recommendation. However, Dr. Dishman testified that he had never actually reviewed Dr. Mathew's written progress notes and recommendations. (Aplt. App. at 309-310) Also on May 20, 2021, Dr. Rhoads sent a text message to Dr. Dishman, stating in relevant part:

> Dr. Mathew stated that he will recommend to SMV that I be reevaluated by KU and Acumen and that I execute a release between the 2 parties so that they can coordinate care. Said releases have already been in place for some time and Dr. Mathew, if he reviewed the documents would be aware of that…. Dr. Mathew wants to punt this back where we were a few months ago. This cannot continue.

(Aplt. App. at 317-318)

On May 21, 2021, Dr. Rhoads and Dr. Dishman had a lengthy telephone conversation. During this conversation, Dr. Rhoads said that he was very unhappy with his purported assessment by Dr. Mathew the previous day, and that Dr. Mathew's assessment was "unprofessional" and "a farce." Dr. Dishman then apologized for Dr. Rhoads' interaction with Dr. Mathew and said that he, Dr. Dishman, accepted responsibility for what happened. (Aplt. App. at 461)

Also during the telephone conversation on May 21, 2021, Dr. Dishman stated that Acumen "has to be our source of truth," and that he wanted Dr. Rhoads to be reevaluated by Acumen. Dr. Rhoads responded that going back to Acumen would be redundant because Acumen had already sent its final written evaluation to Dr. Brey in April of 2021. Dr. Rhoads further stated that in its final evaluation, Acumen stated that Dr. Rhoads' treating providers at KU should be the ones to make the recommendations regarding Dr. Rhoads' return to work at Stormont. Dr. Rhoads' further stated that in April of 2021, Dr. Graham told Dr. Brey that Acumen considered its evaluation of Dr. Rhoads to be complete. (Aplt. App. at 461)

Also during the telephone conversation on May 21, 2021, Dr. Rhoads told Dr. Dishman that he had been most recently evaluated by KU on May 10, 2021, and that KU recommended that he could return to work 8 hours per day with oversight. Dr. Rhoads further said he believed that Dr. Dishman was ignoring the evaluations and recommendations by KU. Dr. Dishman responded, "I have not read your records, and I am not going to read your records." (Aplt. App. at 461-462)

Also during the telephone conversation on May 21, 2021, Dr. Dishman asked Dr. Rhoads, "what do you want to happen?" Dr. Rhoads replied that he wanted to be reinstated to employment with Stormont as recommended by KU. (Aplt. App. at 462)

In his deposition, Dr. Dishman testified that he himself was not trained in determining how to accommodate a physician with a disability, and therefore he wanted Dr. Rhoads to return to Acumen. (Aplt. App. at 456-457) Dr. Dishman explained:

> [The] Kansas Board of Healing Arts seeks out Acumen as the expert in this area. And so knowing that, we requested that Dr. Rhoads return to Acumen so we could develop a specific practical plan for determination of how to proceed.

(Aplt. App. at 457)

Despite Dr. Dishman's view of Acumen "as the expert in this area," he conceded in his deposition that he did not personally review any evaluations of Dr. Rhoads by Acumen during 2021. He testified:

16

> Q.     At any time during 2021 do you recall yourself ever reviewing any of the evaluations, letters, assessments from Acumen about Dr. Rhoads and his return to work? ….
>
> A.     No, I do not.

(Aplt. App. at 455)

## I.     The Interactive Process Between The Parties' Attorneys

After May 27, 2021, Dr. Rhoads and Stormont engaged in the interactive process required by the ADA through their respective attorneys. (Aplt. App. at 42, 322-359) On June 14, 2021, Dr. Rhoads' attorney sent an email to Stormont's attorney, stating in relevant part:

> As we have discussed, Dr. Rhoads is willing to consider reassignment to an administrative position with Stormont Vail which would not require direct patient care, and which would not require Dr. Rhoads to seek activization of his privileges at Stormont. Accordingly, in furtherance of the interactive process required by the ADA, please send me a list of the administrative positions at Stormont which are currently vacant, or will become vacant in the fairly immediate future.

(Aplt. App. at 322)

On June 18, 2021, Stormont's attorney emailed a letter to Dr. Rhoads' attorney, addressing a variety of issues. (Aplt. App. at 325-328) One of these issues was whether Dr. Rhoads could return to any position at Stormont involving patient care. As to this issue, the June 18 letter stated: "Based on [the] reports from doctors of Dr. Rhoads own choosing, Dr. Rhoads is not able to return to his position

17

as a Hospitalist or <u>any other position</u> with SVH that involves patient care." (Aplt. App. at 325. Emphasis added.)

On June 23, 2021, Dr. Rhoads' attorney emailed a response letter to Stormont's attorney, clarifying Dr. Rhoads' position on two issues. The first issue was whether Dr. Rhoads could return to any position at Stormont involving patient care. As to this issue, the June 23 letter stated:

> Dr. Rhoads and I agree that his not able (at this point in time) to return to his position as a Hospitalist, but we firmly believe that he is able to return as a provider of outpatient/primary care. Our belief is based on the most <u>current</u> assessments of Dr. Rhoads by Dr. Ryan A. Townley on April 14, 2021, and by Lindsey Gillen, APRN-NP on May 10, 2021.

(Aplt. App. at 330. Emphasis in original.)

The second issue was what positions Dr. Rhoads was requesting to be reassigned to. As to this issue, the June 23 letter stated:

> I concede that my email of June 14 to you is unclear and may be misleading. So to clarify, Dr. Rhoads in willing to consider not only (1) reassignment to an administrative position with Stormont Vail which would not require direct patient care, <u>but also</u> (2) reassignment to a position as a provider of outpatient/primary care.

(Aplt. App. at 331. Emphasis in original.)

Dr. Rhoads' attorney attached copies of three documents to his June 23 letter: (1) Dr. Townley's assessment of Dr. Rhoads on April 14, 2021; (2) Ms. Gillen's assessment of Dr. Rhoads on May 10, 2021; and (3) Dr. Rhoads' resume

which was current through March of 2011, at which point Dr. Rhoads was hired by Stormont as a Hospitalist. (Aplt. App. at 332-342)

On July 1, 2021, Dr. Rhoads filed an administrative charge against Stormont with the Kansas Human Rights Commission ("KHRC"), which was cross-filled with the EEOC. In his administrative charge, Dr. Rhoads asserted that Stomont had discriminated against him because of his disability, and further that Stormont had retaliated against him for engaging in protected activities. (Aplt. App. at 462)

Dr. Dishman testified in his deposition that during April, May, and June of 2021, there were vacant positions at Stormont for a physician to provide outpatient services. (Aplt. App. at 458-459) Nevertheless, Stormont continued to insist that Dr. Rhoads could not return to any position involving patient care. Accordingly, on July 2, 2021, Stormont's attorney emailed a letter to Dr. Rhoads' attorney. (Aplt. App. at 344-347) The July 2 letter summarized Stormont's position as follows:

> Simply stated, there is no reasonable accommodation SVH can make that will allow Dr. Rhoads to be in a doctor-patient relationship. Understanding this, I do not believe my client and your client are talking about the same vacant position for the interactive process. I believe we need to get his issue resolved before we can talk about what vacant positions exist that Dr. Rhoads may be qualified to fill, which conversation my client is more than willing to have as long as we are talking about the same types of positions. Otherwise, the discussion will be fruitless.
>
> ….
>
> If we can agree on the type of vacant position that is to be considered, I will schedule a conference call to discuss possible positions to which Dr. Rhoads may be

> reassigned. Following that discussion, SVH will decide
> what reassigned position to offer Dr. Rhoads.

(Aplt. App. at 346-347)

On July 9, 2021, Dr. Rhoads' attorney sent an email to Stormont's attorney,

notifying him of Dr. Rhoads' KHRC charge against Stormont. The July 9 email

stated in relevant part:

> Both Dr. Rhoads and I believe that Stormont has violated
> the ADA, as well as Dr. Rhoads' employment contract, by
> refusing to accommodate him by reassigning him to
> outpatient/primary care. However, because litigation will
> be both expensive and time-consuming, Dr. Rhoads is
> willing to explore a possible resolution of all of his claims
> against Stormont through a mediation with Midland
> Mediation. I hope that Stormont is likewise willing to
> participate in a mediation with Midland.

(Aplt. App. at 349)

### J.    The Status of Dr. Rhoads' Medical Staff Privileges

Dr. Rhoads' Medical Staff privileges at Stormont were due to expire on

August 31, 2021. (Aplt. App. at 283) In regard to a Medical Staff member who is on

a leave of absence, the Medical Staff by-laws and rules state: "If an individual's

current appointment is due to expire during the leave, the individual's appointment

and clinical privileges will expire at the end of the appointment period, and the

individual will be required to apply for reappointment." (Aplt. App. at 225)

Karen Reed-Coffman is employed by Stormont as the Director of Medical

Services, and she oversees the credentialing and privileging of practitioners in

Stormont's hospital. (Aplt. App. at 446) In regard to the reappointment of practitioners to Stormont's Medical Staff, Ms. Reed- Coffman testified as follows:

> So when a practitioner does not submit his or her reappointment application, our process is, in the Medial Staff, <u>we contact them both by email and phone</u> attempting to determine whether it is by omission or if its [by] intent. So if a practitioner is not intending to reappoint then – we want to give every practitioner an opportunity to reappoint timely.

(Aplt. App. at 283. Emphasis added.)

Ms. Reed-Coffman further testified that her office attempted to contact Dr. Rhoads about his failure to renew his privileges both by email and phone. (Aplt. App. at 283) Ms. Reed-Coffman also testified that she was not aware of any physician whose employment had been terminated by Stormont because of the failure to renew his or her privileges. (Aplt. App. at 282)

In contrast, Dr. Rhoads testified that he was never contacted by the Medical Staff office about renewing his privileges, either by email or phone. (Aplt. App. at 441) He agreed that "your allegation is that you did not receive the application to renew your privileges nor receive any phone call from anyone reminding you." (Aplt. App. at 442)

On August 26, 2021, Dr. Robert Kenagy, M.D., who is employed by Stormont as the President and Chief Executive Officer, signed a letter addressed to Dr. Rhoads. (Aplt. App. at 463) This letter stated in relevant part:

> On behalf of Stormont Vail Health Governing Board, I wish to inform you that your request to resign from the Medical Staff effective 08/31/21 has been accepted.

21

(Aplt. App. at 463) Dr. Rhoads did not receive this letter until October 9, 2021. This letter is false because Dr. Rhoads never requested to resign from Stormont's Medical Staff. (Aplt. App. at 463)

### K.    The KHRC Mediation on September 15, 2021

On September 14, 2021, Dr, Rhoads' attorney emailed a letter to Stormont's attorney. (Aplt. App. at 358-359) The first paragraph by the September 14 letter stated:

> This letter will follow-up my email to you on August 3, 2021. As I stated in that email, I think the parties will be mediating two issues during our mediation on September 15, 2021, with Midland Mediation: (1) Are there any reasonable accommodations which can be implemented, so that Dr. Rhoads can be reassigned to a position providing primary/outpatient care? (2) If not, is there a monetary payment which can be made to Dr. Rhoads for his damages, in return for which he will release Stormont-Vail Health Care, Inc. ("SVH"), of all liability on all claims? I want to address these two issues in turn.

(Aplt. App. at 358)

On September 15, 2021, Dr. Rhoads and Stormont engaged in a mediation session with Midland Mediation as part of Dr. Rhoads' KHRC proceedings. Darlene Stone attended the mediation on behalf of Stormont, and she is employed by Stormont as the Senior Vice President and Chief Experience Officer. (Aplt. App. at 474-476)

22

Ms. Stone testified in her deposition that during the KHRC mediation, the parties specifically discussed reassignment of Dr. Rhoads to a position which would not require direct patient care. (Aplt. App. at 475-476) She stated:

> I recall him stating he wanted another employment opportunity that he could do. <u>We did discuss or share with him that there were other positions he could do as a non-physician.</u> Door screener is one of those I recall. That would be an entry-level position paying $15 an hour. I don't believe he elected to do that.

(Aplt. App. at 475. Emphasis added.)

Ms. Stone further testified that prior to the mediation, she looked at job postings at Stormont for administrative positions, saying:

> Q.    …[D]id you actually prepare a list of the positions that were available in September of 2021, administrative positions?
>
> A.    I did not. I looked at job postings to see where we had needs and openings. That was kind of the extent that I recall.
>
> …….
>
> There's no documents. All our job openings are electronic. They are online.

(Aplt. App. at 476)

During the course of discovery in this lawsuit, Dr. Rhoads requested Stormont to produce all postings of any vacant administrative position at Stormont, from January 1, 2021 to the present, which did not require direct patient care. Pursuant to this request, Stormont produced a list of 1,054 vacant positions. (Aplt. App. at 462)

According to Dr. Rhoads' resume, which was attached to his attorney's letter of June 23, 2021, Dr. Rhoads had been employed by Stormont as physician in the Cotton O'Neil Clinic for 15 years, and as a hospitalist for 10 years, for a total of 25 years. Dr. Rhoads had also been employed in private practice in internal medicine in the Kansas City area for an additional 9 years, including managing his own clinic for 5 years. Dr. Rhoads also had served on various Medical Quality Improvement or Evaluation Committees for 6 years, plus he had a B.S. degree in business administration. (Aplt. App. at 340-341)

Based on his education, training, and experience, Dr. Rhoads was qualified for all of the following administrative positions at Stormont, which were vacant at some point between April and October of 2021:

| Requisition ID | Job Title |
|---|---|
| #249 | Vice President and Regional Administrator |
| #289 | Medical Laboratory Scientist |
| #301 | Senior Organizational Development Consultant |
| #356 | Vice President of Ancillary and Support Services |
| #373 | Community Engagement Coordinator |
| #411 | Credentialing Supervisor |
| #413 | Integrity and Compliance Specialist |
| #417 | Quality Improvement Specialist |
| #468 | Manager of Provider Compensation and Clinic Operations |

#527                              Manager of Compliance and Integrity

(Aplt. App. at 462-463)

Stormont did not offer Dr. Rhoads any of the administrative positions set forth above. Dr. Rhoads would have accepted reassignment to any of the vacant administrative positions set forth above because his long-term disability benefits will expire in September of 2023, and because his pension and social security benefits would not have been affected. (Aplt. App. at 463)

### L.    The Termination of Dr. Rhoads' Employment

Ms. Stones testified that during the KHRC mediation on September 15, 2021, Stormont made the decision to terminate Dr. Rhoads' employment. She stated:

> We came to resolution in that meeting with Dr. Rhoads that we can't just have him hanging out in limbo…. He wasn't actively doing his job duties. So we resolved it at that mediation. Okay. So you're aware, we're all clear, we're ending this today.

(Aplt. App. at 475)

On October 13, 2021, Stormont's attorney sent a letter to Dr. Rhoads' attorney, confirming that Dr. Rhoads' employment had been terminated on September 15, 2021. The October 13 letter asserted that Dr. Rhoads had breached his Employment Agreement because: (1) he had not maintained his Medical Staff privileges; (2) he had not provided full-time professional services for almost a year; (3) he had not provided on-call services for almost a year; and (4) his disability

prevented him from performing the duties detailed in his Employment Agreement. (Aplt. App. at 392-395)

## M.     Proceedings In the District Court Below

Following discovery, Stormont filed a motion for summary judgment on all four of Dr. Rhoads' claims. (Aplt. App. at 56) The district court granted Stormont's motion its entirety. (Aplt. App. at 497-519)

In regard to Dr. Rhoads' failure-to-accommodate claim, the district court concluded that Stormont could not reasonably accommodate Dr. Rhoads' request for reassignment to a position providing outpatient care because he posed a direct threat to patient safety, and also because such a reassignment would impose an undue burden on Stormont. (Aplt. App. at 508-511) The district court further concluded that during the interactive process Dr. Rhoads "completely abandoned" his request for reassignment to an administrative position which did not require direct patient care. (Aplt. App. at 512-513)

## ARGUMENTS AND AUTHORITIES

The court reviews a grant of summary judgment de novo, and "must draw all reasonable inferences in favor of the nonmoving party." Sanderson v. Wyo. Highway Patrol, 976 F.3d 1131, 1173 (10th Cir. 2020) Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Pro. 56(a).

In considering whether there are any genuine issues of material fact, "the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party." Gullickson v. Southwest Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th Cir. 1996). See also Aubrey v. Koppes, 975 F.3d 995, 1004 (10th Cir. 2020); Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d 1136, 1143 (10th Cir. 2013). In analyzing a summary judgment motion, the court "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000). The nonmoving party must be given "wide berth to prove a factual controversy exists." Jefferies v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998).

Here, the district court failed to view the record in the light most favorable to Dr. Rhoads, and erroneously weighed the evidence. When the record is properly viewed in the light most favorable to Dr. Rhoads, a reasonable jury could return a verdict in favor of Dr. Rhoads on his failure-to-accommodate claim.

## I. A REASONABLE JURY, FACED WITH THE EVIDENCE PRESENTED, COULD RETURN A VERDICT IN FAVOR OF DR. RHOADS ON HIS FAILURE-TO-ACCOMMODATE CLAIM

The elements of Dr. Rhoads' claims under the ADA and the RA are substantially the same, and the legal analysis of the claims is also substantially the same. Sullivan v. Univ. of Kansas Hosp. Auth., 844 Appx. 43, 48 (10th Cir. 2021), citing Fitzgerald v. Corr. Corp. of Am., 403 F.3s 1134, 1144 (10th Cir. 2005).

Consequently, Dr. Rhoads' claims under the ADA and the RA will be discussed together below.

### A.     The Summary Judgment Framework For Analyzing Dr. Rhoads' Failure-To-Accommodate Claim

This court has adopted a modified version of the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for analyzing a failure-to-accommodate claim on the summary judgment context. Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017). As this court explained in the seminal case of Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cor. 1999) (en banc):

> The purpose of the burden shifting approach is a bit different in an ADA Failure to Accommodate case. In such a case, the Congress has already determined that a failure to offer a reasonable accommodation to an otherwise qualified disabled employee is unlawful discrimination…. Thus, we use the burden-shifting mechanism, not to probe the subjective intent of the employer, but rather simply to provide a useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered.

180 F.3d at 1178, n.12. Emphasis in original.

Once an employee requests reassignment as an accommodation, both the employee and employer have an obligation to engage in an interactive process, which "is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee," and "is typically an essential

component of the process by which a reasonable accommodation can be determined". Herrmann v. Salt Lake City Corp., 21 F.4th 666, 674 (10th Cir. 2021), quoting Smith, 180 F.3d at 1172.

The establish a prima facie case of reassignment as a possible accommodation, a plaintiff must show five elements under a modified McDonnell Douglas framework:

(1)    The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his disability known to the employer;

(2)    The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished;

(3)    The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process in which the employee in good faith was willing to, or did, cooperate;

(4)    The employee was qualified, with or without accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the reassignment was made; and

(5)    The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

<u>Herrmann</u>, 21 F.4th at 674-75, quoting <u>Smith</u>, 180 F.3d at 1179.

If a plaintiff establishes a prima facie case, the burden then shifts to the defendant to "present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima face case or (2) establishing an affirmative defense." <u>Herrmann</u>, 21 F.4th at 674, quoting <u>Punt</u>, 862 F.3d at 1050.

## B.     A Reasonable Jury Could Find That Dr. Rhoads Has Established A Prima Facie Case Regarding His Request For Reassignment To A Position <u>Providing Outpatient Care</u>

The district court concluded that Dr. Rhoads has established the first three elements of his prima facie case regarding his request for reassignment to a position providing outpatient care. (Aplt. App. at 506-508) Accordingly, only the fourth and fifth elements of Dr. Rhoads' prima facie case are at issue in regard to this request for reassignment.

## (1.) A Reasonable Jury Could Find That Dr. Rhoads Was Qualified, With Accommodation, To Perform The Duties of <u>An Outpatient Physician</u>

In regard to the fourth element of Dr. Rhoads' prima facie case, a plaintiff must initially demonstrate that his performance of the essential functions of a proposed accommodation would not significantly threaten the health and safety of others; "otherwise the accommodation would not be 'reasonable on its face'". <u>Osborne v. Baxter Healthcare Corp.</u>, 798 F.3d 1260, 1268-69 (10th Cir. 2015), quoting <u>U.S. Airways v. Barnett</u>, 535 U.S. 391, 402 (2002). This requirement

implicates a legal standard in the ADA known as "direct threat". <u>Osborne</u>, 798 F.3d at 1268.

The ADA defines a "direct treat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111 (3). In <u>Jarvis v. Potter</u>, 500 F.3d 1113 (10th Cir. 2007), this court held:

> In evaluating an employer's direct-threat contention, the fact-finder does not independently assess whether it believes that the employee posed a direct threat. Nor must it accept the contention just because the employer acted in good faith in deciding that the employee posed such a threat. …[Rather], <u>the fact-finder's role is to determine whether the employer's decision was objectively reasonable.</u>

500 F.3d at 1122. Emphasis added. See also <u>Osborne</u>, 798 F.3d at 1269.

Here, the district court concluded that Stormont's decision that Dr. Rhoads posed a direct to patients was objectively reasonable, saying:

> A mistake by Plaintiff could have put a patient in imminent danger or even caused a patient's death, as Plaintiff admitted. It is clear that Plaintiff posed a direct threat to patients if he was responsible for patient care.

(Aplt. App. at 509)

In reaching this conclusion, the district court erroneously weighed the evidence, and failed to view the record in the light most favorable to Dr. Rhoads. A reasonable jury, viewing the record in the light most favorable to Dr. Rhoads, could find that Stormont's belief that Dr. Rhoads posed a direct threat to patients was not objectively reasonable, based upon the following factors.

First of all, Dr. Dishman, who was the decision maker for Stormont, testified that he himself was not trained in determining how to accommodate a physician with a disability, and that Acumen was "the expert in this area". (Aplt. App. at 456-457) However, Dr. Dishman conceded that he did not personally review any evaluations of Dr. Rhoads by Acumen during 2021. (Aplt. App. at 455)

Second, in its initial evaluation of Dr. Rhoads on January 8, 2021, Acumen recommended further evaluation of Dr. Rhoads, "including a proctor observed practice in performance (PIP) process to see if he can function in a less demanding medical/primary care role." (Aplt. App. at 126)

Third, in its final evaluation of Dr. Rhoads on April 13, 2021, Acumen recommended that Dr. Rhoads should consult with his treating providers at KU "to discuss return to work in a supervised outpatient clinical position where his documentation and clinical decision making can be reviewed by a physician colleague working in the same setting and he can be observed throughout the workday by a defined group of coworkers/nurses". (Aplt. App. at 478)

Fourth, on April 14, 2021, Dr. Townley, who was Dr. Rhoads' primary treating provider at KU, had a conversation with Dr. Brey to discuss Dr. Rhoads' potential return to work. During this conversation, Dr. Townley mad essentially the same recommendation as Acumen, namely, that Dr. Rhoads could "return to outpatient medicine… [e]ither working closely with a nurse/practitioner/PA and/or

someone overseeing documentation/treatment plans to make sure he is performing well…." (Aplt. App. at 479)

Fifth, on May 10, 2021, Ms. Gillen, APRN-NP, who was another treating provider at KU, evaluated Dr. Rhoads once again. And once again, she made essentially the same recommendation as Acumen and Dr. Townley:

> Our recommendation is that he can return to work with an average workday of approx. 8 hrs. per day, no more than 5 days per week. A process of evaluation should be in place to follow and evaluate his work performance.

(Aplt. App. at 338)

Sixth, Dr. Brey testified in her deposition that when a physician is first granted privileges as a member of Stormont's Medical Staff, the physician must go through a proctoring process, which can last up to one year. (Aplt. App. at 467-468) Dr. Brey further testified that if a problem comes up regarding the medical services being provided by a physician with full privileges, then the proctoring process can be reinitiated. (Aplt. App. at 468) Dr. Brey further testified that the proctoring process had been reinitiated for at least one physician, Dr. Baraban, after he had endured a prolonged hospital stay, and perhaps suffered a stroke. (Aplt. App. at 469)

Seventh, Dr. Rhoads testified that he understood Acumen's recommendation, in its final evaluation on April 13, 2021, to mean "that Stormont's proctoring process should be reinitiated". (Aplt. App. at 461) Dr. Rhoads went on to explain:

> I am very familiar with Stormont's proctoring process. I participated in the proctoring process when I was first granted privileges at Stormont. I also participated in the proctoring process multiple times as the reviewing or proctoring physician.

(Aplt. App. at 461)

Based on the above factors, a reasonable jury could find that any significant risk to the health or safety of patients could be eliminated by reasonable accommodation, namely, by reinitiation of Stormont's proctoring process for Dr. Rhoads. This would involve, in the words of Acumen, Dr. Rhoads' return to work "in a supervised outpatient clinical position where his documentation and clinician decision making can be reviewed by a physician colleague working in the same setting and he can be observed throughout the workday by a defined group of coworkers/nurses." (Aplt. App. at 478) Based on such a finding, a reasonable jury could further find that Dr. Dishman's belief that Dr. Rhoads posed a direct threat to patients was not objectively reasonable.

### (2.) A Reasonable Jury Could Find That Dr. Rhoads Suffered An Injury

In regard to the fifth element of Dr. Rhoads' prima facie case, it is undisputed that Dr. Rhoads suffered an injury because Stormont refused to reassign him to a position providing outpatient care. As Stormont's attorney stated in his letter of July 2, 2021, to Dr. Rhoads' attorney: "Simply stated, there is no reasonable accommodation SVH can make that will allow Dr. Rhoads to be in a doctor-patient relationship." (Aplt. App. at 346)

### C.    A Disputed Issue Of Fact Exists As To Stormont's Affirmative Defense Regarding Dr. Rhoads' Request For Reassignment To A Position <u>Providing Outpatient Care</u>

Because a reasonable jury could find that Dr. Rhoads has established a prima facie case regarding his request for reassignment to a position providing outpatient care, the burden then shifts to Stormont to "present evidence… establishing an affirmative defense." <u>Herrmann</u>, at 674. As an affirmative defense, Stormont contends that Dr. Rhoads' request for reassignment to a position providing outpatient care would impose an undue hardship on Stormont. (Aplt. App. at 84)

The ADA defines an undue hardship as "an action requiring significant difficulty or expense." 42 U.S.C. § 12111 (10) (A). The ADA also specifies factors to be considered in the undue hardship inquiry, including:

> (i)    the nature and cost of the accommodation needed under this chapter;
>
> (ii)    the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

42 U.S.C. § 1211 (10) (B). See also <u>Osborne</u>, 798 F.3d at 1267-68, n.9.

Here, the district court concluded that Stormont has conclusively established its affirmative defense of undue hardship, stating:

> Although the court is without evidence to consider
> many of the factors, the court finds the first factor

decides the issue. The nature of this accommodation is not reasonable because it likely requires Defendant to engage in illegal conduct, having on APRN or PA engaging in the unlicensed practice of medicine while they supervise a physician.

….

Furthermore, the cost of this accommodation is not reasonable. If Stormont Vail could hire an APRN or PA to supervise Plaintiff and work alongside him (and as stated before, legally, it cannot), it would cost defendant between $112,050.00 and $225,432.00. Even without information to consider the overall financials of the institution, this is an excessive cost. If Stormont Vail were to hire another physician to supervise Plaintiff (which is a more legally sound option in terms of licensing), it would cost Defendant between $458,625.00 and $1,473,958.00. Again, this is a tremendously burdensome cost. This requested accommodation is both an undue burden and unreasonable.

(Aplt. App. at 511)

In reaching this conclusion, the district court again erroneously weighed the evidence, and failed to view the record in the light most favorable to Dr. Rhoads. A reasonable jury, viewing the record in the light most favorable to Dr. Rhoads, could find Stormont's affirmative defense of undue hardship to be unworthy of belief, based upon the following factors.

First, Stormont's affirmative defense of undue hardship is predicated on a misunderstanding of, or a misrepresentation of, Dr. Rhoads' request for reassignment to a position providing patient care. When the record is read in the light most favorable to Dr. Rhoads, he did not propose that "he should work with

an Advanced Practice Registered Nurse ("APRN") or Physician's Assistant ("PA") for supervision and to ensure patient safety." (Aplt. App. at 502) Rather, as explained above, what Dr. Rhoads proposed was that Stormont reinitiate the proctoring process in regard to his outpatient services. Again, this would involve, in the words of Acumen, Dr. Rhoads' return to work "in a supervised outpatient clinical position where his documentation and clinical decision-making could be reviewed by a physician colleague working in the same setting and he can be observed throughout the workday by a defined group of coworkers/nurses." (Aplt. App. at 478)

Second, Stormont has presented no evidence regarding the cost of reinitiating the proctoring process for Dr. Rhoads in an outpatient clinical position. In addition, as the district court acknowledged (Aplt. App. at 511), there is no evidence in the record relating to many of the factors set forth in § 12111 (10) (B), including "(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation…."

Third, Dr. Brey testified that Stormont had reinstated the proctoring process for Dr. Baraban, after he had endured a prolonged hospital stay, and perhaps suffered a stroke. (Aplt. App. at 469) A reasonable jury could infer from this evidence that Stormont could likewise reinitiate the proctoring process for Dr. Rhoads without undue hardship.

### D.     A Reasonable Jury Could Find That Dr. Rhoads Has Established A Prima Facie Case Regarding His Request For Reassignment To An <u>Administrative Position Not Requiring Direct Patient Care</u>

The district court concluded that Dr. Rhoads has established the first two elements of his prima facie case regarding his request for reassignment to a position which did not require direct patient care. (Aplt. App. at 506) Accordingly, only the third, fourth, and fifth elements are at issue in regard to this request for reassignment.

### (1.) A Reasonable Jury Could Find That Dr. Rhoads Did Not Abandon His Request For Reassignment To An Administrative Position During The <u>Interactive Process</u>

In regard to the third element of Dr. Rhoads' prima facie case, the district court concluded that Dr. Rhoads "completely abandoned" his request for reassignment to an administrative position during the interactive process, and therefore he cannot show that he engaged in the interactive process in good faith. (Aplt. App. at 512-513) The district court stated:

> The uncontroverted facts show that Plaintiff engaged in the interactive process primarily through his attorney during the late spring and summer of 2021. In June 2021, Plaintiff requested reassignment to an administrative position. Defendant responded and requested to set up a conference call between the parties and the attorneys to discuss Plaintiff's qualifications and the positions. That conference call never occurred, and Plaintiff did not again ask about reassignment to an administrative position.
>
> ….
>
> And when Defendant presented a door screener position as a potential option to Plaintiff at the mediation

> in September of 2021, he did not accept that position. Plaintiff cannot now argue that he pursued reassignment to an administrative position in good faith when he completely abandoned that accommodation during the interactive process.

(Aplt. App. at 513)

Once again, the district court erroneously weighed the evidence, and failed to view the record in the light most favorable to Dr. Rhoads. A reasonable jury, viewing the record in the light most favorable to Dr. Rhoads, could find that Dr. Rhoads did not "completely abandon" his request for reassignment to an administrative position, based on two factors.

First, on June 23, 2021, Dr. Rhoads' attorney emailed a letter to Stormont's attorney expressly requesting "reassignment to an administrative position with Stormont Vail which would not require direct patient care." (Aplt. App. at 331) About a week later, on July 1, 2021, Dr. Rhoads filed an administrative charge against Stormont with the KHRC, alleging disability discrimination. (Aplt. App. at 462) Then, on July 9, 2021, Dr. Rhoads' attorney proposed that the parties "explore a possible resolution of all of his claims against Stormont through a mediation with Midland Mediation" as part of the KHRC proceedings. (Aplt. App. at 349. Emphasis added.)

Second, on September 15, 2021, the parties engaged in a mediation session with Midland Mediation as part of the KHRC proceedings. (Aplt. App. at 474-476) Importantly, during this mediation session, the parties specifically

discussed reassignment of Dr. Rhoads to a position which would not require direct patient care. In her deposition, Ms. Stone testified:

> I recall him stating he wanted another employment opportunity that he could do. <u>We did discuss or share with him that there were other positions he could do as a non-physician.</u>

(Aplt. App. at 475. Emphasis added.) Ms. Stone further testified that prior to the mediation session on September 15, she "looked at job openings to see where we had needs and openings." (Aplt. App. at 476)

### (2.) A Reasonable Jury Could Find That Dr. Rhoads Was Qualified To Perform Multiple Administrative Positions Which Were Available About The Time He Made His Request For Reassignment

In regard to the fourth element of his prima facie case, Dr. Rhoads must show that he was qualified "to perform one or more appropriate vacant jobs within the company that [he] must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made." <u>Herrmann</u>, 21 F.4[th] at 675.

A reasonable jury could find that Dr. Rhoads met this burden by submitting two pieces of evidence in response to Stormont's motion for summary judgment.

The first piece of evidence is Dr. Rhoads' resume, which sets forth his education, training, and experience. (Aplt. App. at 340-341) Dr. Rhoads' resume shows that he had been employed by Stormont as physician in the Cotton O'Neil Clinic for 15 years, and as a hospitalist for 10 years, for a total of 25 years. He

had also been employed in private practice in internal medicine in the Kansas City area for an additional 9 years, including managing his own clinic for 5 years. He also had served on various Medical Quality Improvement or Evaluation Committees for 6 years, plus he had a B.S. degree in business administration.

The second piece of evidence consists of Dr. Rhoads' sworn declaration. (Aplt. App. at 460-464) In his declaration, Dr. Rhoads testified that during the course of discovery in this lawsuit, he requested Stormont to produce all postings of any vacant administrative position at Stormont, from January 1, 2021, to the present, which did not require direct patient care. Pursuant to this request, Stormont produced a list of 1,054 vacant positions. (Aplt. App. at 462)

Dr. Rhoads further testified that based on his education, training, and experience, he was qualified for all of the following administrative positions at Stormont, which were vacant at some point between April and October of 2021:

| Requisition ID | Job Title |
|---|---|
| #249 | Vice President and Regional Administrator |
| #289 | Medical Laboratory Scientist |
| #301 | Senior Organizational Development Consultant |
| #356 | Vice President of Ancillary and Support Services |
| #373 | Community Engagement Coordinator |
| #411 | Credentialing Supervisor |
| #413 | Integrity and Compliance Specialist |
| #417 | Quality Improvement Specialist |

| #468 | Manager of Provider Compensation and Clinic Operations |
| #527 | Manager of Compliance and Integrity |

(Aplt. App. at 462-463)

Dr. Rhoads also testified that Stormont did not offer him any of the administrative positions set forth above. (Aplt. App. at 463) In addition, Ms. Stone testified that the only administrative position which was discussed at the mediation on September 15, 2021, was the position of door screener, which was an entry-level position paying $15.00 an hour. (Aplt. App. at 475)

Because Stormont never discussed any of the vacant administrative positions set forth above with Dr. Rhoads during the interactive process, a disputed factual issues exists as to the fourth element of Dr. Rhoads' prima facie case. As this court explained in Aubrey v. Koppes, 975 F.3d 995 (10th Cir. 2020):

> We note… that 'an employer's failure to engage in the interactive process will often make it difficult to resolve a case for the employer on summary judgment'…. That is because, 'when the employer fails to engage in the interactive process, it is not likely that an employer will be able to establish on summary judgment the absence of a disputed fact as to the existence of a reasonable accommodation.'

975 F.3d at 1010, quoting Valdez v. McGill, 462 F. Appx. 814, 819 n.5 (10th Cir. 2012).

### (3.) A Reasonable Jury Could Find That Dr. Rhoads Suffered An Injury

In regard to the fifth element of his prima facie case, Dr. Rhoads testified in his declaration that he would have accepted reassignment to any of the vacant

administrative positions set forth above because his long-term disability benefits will expire in September of 2023, and because his pension and social security benefits would not have been affected. (Aplt. App. at 463) Based on this evidence, a reasonable jury could find that Dr. Rhoads "suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position." <u>Herrmann</u>, 21 F.4th 666, 675.

## CONCLUSION

For the reasons discussed above, the district court erroneously weighed the evidence, and failed to view the record in the light most favorable to Dr. Rhoads. Consequently, the district court erroneously granted summary judgment in favor of Stormont on Dr. Rhoads' failure-to-accommodate claim. Therefore, the summary judgment in favor of Stormont must be reversed, and the case remanded to the district court for a trial on the merits.

## CERTIFICATE OF COMPLIANCE WITH RULE 32

Pursuant to Fed. R. App. Pro. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 10,437 words. I relied on my word processor to obtain this count, and it is Microsoft Word Office 365.

## CERTIFICATE OF DIGITAL SUBMISSION

No privacy redactions were necessary in this document. The document submitted in digital form is an exact copy of the written document filed with the Clerk. The document is a native PDF document. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning

program, Symantec Endpoint Protection - Antivirus and Antispyware Protection Program, most recently updated September 28, 2023, and, according to the program, is free of viruses.

## **ORAL ARGUMENT**

Oral argument is not requested in this case because the issues are straight forward, and oral argument would not likely aid this court in analyzing the issues.

   s/Alan V. Johnson
Alan V. Johnson, KS #9992
Sloan, Eisenbarth, Glassman,
  McEntire & Jarboe, L.L.C.
534 s. Kansas Ave, Suite 1000
Topeka, Kansas 66603
Telephone   (785) 357-6311
Fax          (785) 357-0152
ajohnson@sloanlawfirm.com
ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I herby certify that on the **5th day of September, 2023**, I delivered a copy of the foregoing document via ECF and electronic mail to the following parties:

**GOODELL STRATTON EDMONDS**
**& PALMER LLP**
Susan L. Mauch, #15295
Cameron S. Bernard, #28228
515 South Kansas Ave.
Topeka, KS 66603
Phone:       (785) 233-0593
Facsimile:   (785) 233-8870
slmauch@gseplaw.com
cbernard@gseplaw.com
**ATTORNEYS FOR DEFENDANT**

  /s/Alan V. Johnson
Alan V. Johnson, KS #9992
ajohnson@sloanlawfirm.com

# APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JEFFREY P. RHOADS, M.D.,

       Plaintiff,

v.                                                                    Case No. 22-4005-JWB

STORMONT VAIL HEALTHCARE, INC.,

       Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on Defendant's motion for summary judgment.  (Doc. 46.)  The motion is fully briefed and ready for decision.  (Docs. 47, 50, 51, 54.)  For the reasons stated herein, Defendant's motion is GRANTED.

**I.      Facts and Procedural Background**

The following statement of facts is taken from the parties' submissions.  Factual disputes about immaterial matters are not relevant to the court's determination.  Therefore, immaterial facts and factual averments that are not supported by record citations are omitted.

Plaintiff specializes in internal medicine and served as a hospitalist at Stormont Vail Healthcare, Inc. ("Stormont Vail" or "Defendant").  His employment was dictated by the terms of a Physician Employment Agreement ("Agreement") dated October 1, 2019.  The essential functions and duties of the hospitalist position and any inpatient or outpatient physician position include providing medical care to patients meeting the appropriate standard of care; exercising independent professional judgment related to care and treatment of patients; creating and recommending appropriate treatment plans; creating accurate and complete records of a patient's medical history; updating a patient's charts accurately and completely; leading and coordinating

care of patients; and performing necessary administrative tasks. Plaintiff was required to have medical staff membership and clinical privileges to serve as a hospitalist. (Doc. 47 at 2; Doc. 50 at 2.)

The Agreement contained a provision for termination upon disability, which set out specific terms for Plaintiff's termination if he became unable to perform the essential functions of his position with or without reasonable accommodations. This provision also made clear that Stormont Vail would comply with applicable law and would "explore all reasonable accommodations, including possible reassignment, for a [p]hysician with a disability." (Doc. 47-1 at 11.)

Stormont Vail's Medical Staff[1] is responsible for peer review, credentialing, and quality and patient safety. According to Stormont Vail's credentials policy, all physicians, whether employed by Stormont Vail or not, must be granted privileges to practice at Stormont Vail. These privileges are often specific to a practitioner's specialty; for internal medicine, the specialty is a hospitalist. Dr. Kimberly Brey was President of Stormont Vail's Medical Staff during the relevant time.[2] Dr. Traci Cuevas and Dr. Jason Austin were co-medical directors of the adult hospitalist group during the relevant time. (Doc. 47-15 at 3.)

In November 2020, Dr. Cuevas called Dr. Brey to convey concerns from within the hospitalist group that Plaintiff was showing signs of dementia and to inquire about next steps to protect patients. (*Id.* at 4.) Dr. Austin also had concerns about Plaintiff, including a steady decline in the quality of work. Both other doctors and patients reported concerns that doctors had to start

---

[1] Neither Plaintiff nor Defendant explain exactly what the term "Medical Staff" refers to. The Medical Staff likely refers to all of the physicians on staff at Stormont Vail, although at times it appears to refer to a specific subset of physicians, more like a leadership committee.
[2] At the time of Dr. Brey's deposition in September 2022, she indicated that she had been President of Medical Staff for almost two years. (Doc. 47-13 at 3.) She also noted that the position as president lasts for two years. (*Id.*) Today, she is likely no longer president and now likely serves in the post-president position.

completely over when taking over a patient from Plaintiff because Plaintiff had given substandard care and failed to appropriately document or provide specific treatment plans. (Doc. 47-17 at 2–3.) Concerns about Plaintiff dated at least as far back as 2017, although more formal reports were not made at the time. (Doc. 54-5 at 2–3.) The concerns reported by Drs. Cuevas and Austin were consistent with the results of testing done by Plaintiff's neurologist, Dr. Ryan Townley. (Doc. 47-8 at 6.) Plaintiff acknowledged that if he made a mistake with a patient, it could cause the patient harm or even lead to the patient's death. (Doc. 47-18 at 8–9.)

Because of the reported concerns about Plaintiff, and per Stormont Vail's policy, Dr. Brey formed a Physicians' Health and Advocacy Subcommittee (the "Committee") to work through concerns about Plaintiff. (Doc. 47-16 at 2; Doc. 47-19.) The Committee met and discussed Plaintiff and then recommended a temporary and precautionary restriction of Plaintiff's clinical privileges until an evaluation of his cognitive abilities could be completed. (Doc. 47-16 at 3.) Plaintiff was referred to Acumen Assessments, Inc. ("Acumen") for evaluation. (*Id.*; Doc. 47-3 at 2.) Plaintiff scheduled an appointment with Acumen but was unable to be seen until January 4, 2021. (Doc. 47-3 at 2; Doc. 47-16 at 3.) Plaintiff worked his last shift as a hospitalist at Stormont Vail on November 24, 2020. (Doc. 45 at 2.)

Plaintiff began taking leave protected by the Family and Medical Leave Act ("FMLA") on January 11, 2021. He also submitted a request for a 30-day leave of absence on January 12, 2021, which was granted. Then on February 3, 2021, Plaintiff submitted a request to the Medical Staff for a leave of absence of up to one year for health reasons. That request was also granted. (*Id.* at 2–3.) Plaintiff was paid his full base salary until February 10, 2021. He was paid 50% of his base salary from February 11, 2021, until the end of his FMLA leave. (*Id.* at 3.)

In January 2021, Plaintiff received an evaluation from Acumen which indicated "mild-moderate impairment in multiple areas of cognitive function." (Doc. 47-3 at 5.) Plaintiff was diagnosed with Mild Neurocognitive Disorder and was not considered fit to practice medicine at that time. (*Id.* at 10.) Plaintiff also agreed that he likely would not be able to return to his work as a hospitalist. (Doc. 47-18 at 4–5.)

Plaintiff's appointment of clinical privileges was due to expire on August 31, 2021, and Plaintiff was required to apply for reappointment on or before that day. (Doc. 47-21 at 3–4.) Plaintiff did not reapply by that date, which is considered a voluntary withdrawal under Stormont Vail's policy. (*Id.*; Doc. 47-14 at 11.) In order to work as an outpatient physician at Stormont Vail, Plaintiff would have needed to apply for clinical privileges as an outpatient physician.[3] (Doc. 47-13 at 12.) Plaintiff testified at his deposition that he did not apply for those privileges because he was afraid that he would not be accepted, and if he was denied privileges, he would be reported to the Kansas Board of Healing Arts which would cause him additional problems. (Doc. 47-18 at 7.) Plaintiff additionally contends that he did not apply for outpatient privileges because he had not been offered a job as an outpatient physician. (Doc. 50 at 5–6.)

There are two branches overseeing physicians at Stormont Vail: the Medical Staff branch and the administration branch. Dr. Brey was the president of the Medical Staff. The Medical Staff made decisions regarding credentialing for physicians employed by the hospital doing inpatient work. Dr. Dishman is the Chief Medical Officer, near the top of the leadership of the administration branch. Dr. Kenagy is the President and Chief Executive Officer at the top of administration. The administration side is in charge of employment decisions, and Dr. Dishman

---

[3] There is some dispute between the parties as to whether Plaintiff needed to first apply for outpatient privileges and then a position as an outpatient physician or vice versa. (Doc. 47 at 6; Doc. 50 at 5–6; Doc. 54 at 2.)

was the decisionmaker related to Plaintiff's employment.  (Doc. 47-13 at 16–17; Doc. 47-22 at 3, 8–9, 11–14.)

Before Dr. Dishman could allow Plaintiff to return to work following Plaintiff's FMLA leave, Dr. Dishman needed to know that Plaintiff could safely return to work and needed to understand what Plaintiff's capabilities and restrictions were in order to create a plan for Plaintiff's return.  (Doc. 47-22 at 9–10, 15, 21.)  To create a plan for Plaintiff's return and to assess what Plaintiff could safely do, Dr. Dishman asked Plaintiff to complete a fitness for duty assessment with Dr. Soni Mathew, Director of Occupational Health.  (Doc. 47-23 at 3.)  Dr. Dishman testified at his deposition that he was concerned about the lack of specificity as to a plan for how Plaintiff could return to work, asking questions such as what Plaintiff was able to do with and without accommodations and what hours he would be able to work.  (Doc. 47-22 at 21.)

Dr. Mathew evaluated Plaintiff, reviewed his medical records, and recommended that Acumen perform an updated evaluation and provide specific recommendations as to Plaintiff's ability to perform the essential functions of his job and any necessary accommodations.  (Doc. 47-9 at 2–3.)  Plaintiff was frustrated with Dr. Mathew's recommendations.  (Doc. 47-24.)  Dr. Dishman discussed Plaintiff's condition with Dr. Mathew which is when Dr. Dishman determined that the further evaluation by Acumen or the University of Kansas ("KU") was necessary.  (Doc. 54-8 at 3–4.)

Plaintiff felt as if the evaluation with Acumen was complete, and he did not need to return to Acumen for further evaluation.  Plaintiff declined to return to Acumen.  (Doc. 51 at 24.)  Dr. Brey had a conversation with Plaintiff around May 4, 2021, in which she explained to Plaintiff that she "believed the evaluation was completed as well through Acumen and [she] was not aware of a reason that he needed to be seen or evaluated by Acumen again."  (Doc. 47-35 at 4.)  But Dr.

Brey also reminded Plaintiff that "the issue with Dr. Matthew is from administration and they would need to answer those questions." (*Id.*) Dr. Dishman offered Plaintiff two weeks of pay to be evaluated by Acumen and to work with them to come up with a solution that would allow Plaintiff to return to work, with or without accommodations. (Doc. 47-22 at 18–19.) Plaintiff declined the offer. (Doc. 47-25 at 2.)

Plaintiff and Stormont Vail continued engaging in the interactive process through their attorneys from this point forward. While engaging in the interactive process, Plaintiff's attorney admitted that Plaintiff could not return to Stormont Vail as a hospitalist, but instead requested an accommodation so that Plaintiff could work as an outpatient physician. (Doc. 47-28 at 2–3.) Plaintiff, based on some of the recommendations of his healthcare providers, took the position that as a reasonable accommodation, he should work with an Advanced Practice Registered Nurse ("APRN") or Physician's Assistant ("PA") for supervision and to ensure patient safety. (Doc. 47-18 at 24–27.) It would cost Stormont Vail between $112,050.00 and $225,432.00 to hire an APRN or PA to do this type of work. To hire a hospitalist or outpatient physician to work with Plaintiff, it would cost Stormont Vail between $458,625.00 and $1,473,958.00. (Doc. 47-34 at 2–3.)

Stormont Vail has a process called proctoring. Proctoring happens when a new physician initially gets privileges at Stormont Vail and is sometimes used at other times. The proctoring process generally involves one physician looking over documents for another physician but is not technically oversight. This must be done by a peer, i.e., one physician looks over another physician's work, but a PA or APRN could not look over a physician's work. (Doc. 54-1 at 5; Doc. 54-4 at 4–5.)

Plaintiff also requested reassignment to an administrative position which would not require patient care as a reasonable accommodation. (Doc. 47-26 at 2; Doc. 47-33 at 6.) At some point

6

during discussions, Plaintiff told Dr. Brey that he wanted to be the best paid copy boy ever.  (Doc. 47-18 at 15–16; Doc. 47-35 at 3.)  On July 1, 2021, Plaintiff filed a charge of discrimination against Stormont Vail.  (Doc. 45 at 3.)

On July 2, 2021, Stormont Vail's attorney requested a conference call with Plaintiff and his attorney to discuss potential reassignment to an administrative position, but that conference call never occurred.[4]  (Doc. 47-18 at 17–18; Doc. 47-29 at 2, 4–5.)  Plaintiff's attorney sent Stormont Vail's attorney a letter on September 14, 2021, discussing either reassignment to an outpatient position with supervision or a monetary payment to Plaintiff.  (Doc. 47-32 at 2–3.)  This letter came one day before the September 15 mediation of Plaintiff's discrimination charge and does not mention reassignment to an administrative position.  (*Id.*; Doc. 47-34 at 6.)  At the mediation, Plaintiff and Stormont Vail discussed an open position as a door screener at the hospital, which would have paid only $15 per hour.  (Doc. 47-34 at 5.)  Many of the other vacant positions would have required licenses that Plaintiff did not have.  (*Id.*)  Plaintiff graduated with his undergraduate degree in business administration in 1978 but has never worked in an administrative capacity and has not recently taken any courses in administration.  (Doc. 47-28 at 12; Doc. 54-9 at 3–5.)

In June or July 2021, Plaintiff asked Dr. Townley for clarification on his condition and for additional testing.  In August, Dr. Townley noted in Plaintiff's medical records that Plaintiff "now has two objective biomarkers highly consistent with the working diagnosis of nonamnestic mild cognitive impairment due to suspected Lewy body disease.  These include the FDG-PET scan and the CSF synuclein test.  Neither of these tests are abnormal because of his COVID infection." (Doc. 47-11 at 10.)  Plaintiff testified at his deposition that "Alpha synuclein now has been found

---

[4] It is not clear why this call never occurred or if a call was ever scheduled.

7

in people with previously undetected spinal taps to appear in people with COVID." (Doc. 47-18 at 21.) Plaintiff executed releases allowing Stormont Vail access to his medical records from KU. (Doc. 51 at 24.) Plaintiff's employment with Stormont Vail was terminated on September 15, 2021. (Doc. 47-38 at 4.)

Plaintiff brought this suit on January 19, 2022, alleging failure to accommodate, retaliation, and unlawful termination under the Americans with Disabilities Act ("ADA") and Rehabilitation Act of 1973 ("RA"). (Doc. 23 at 13–15.) Plaintiff also brought a claim for breach of his employment contract. (*Id.* at 16.)

## II.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.    Analysis

Plaintiff brings four counts against Defendant under the RA, the ADA, and his employment contract: (1) failure to accommodate; (2) retaliation; (3) unlawful termination; and (4) breach of contract.  (Doc. 45.)

**A.  Failure to Accommodate**

The court notes that Plaintiff has conceded that he could no longer work as a hospitalist and that he is only pursuing claims of failure to accommodate by reassignment.  (Doc. 47-18 at 5; Doc. 45 at 12.)  Plaintiff contends that Defendant failed to accommodate his disability when it did not reassign him to a vacant position, either in an administrative capacity or as an outpatient physician.  (Doc. 45 at 12.)  Defendant argues that it engaged in the interactive process in good faith and that Plaintiff caused a breakdown in the interactive process.  (Doc. 47 at 13–18.) Defendant also argues that there were no reasonable accommodations that would have allowed Plaintiff to continue treating patients and that Plaintiff's suggested accommodations for supervision would cause an undue burden on Defendant.  (*Id.* at 18–26.)  Plaintiff responds that he did not cause a breakdown in the interactive process and that reasonable accommodations existed that would not have caused an undue burden.  (Doc. 50 at 24–28.)

The ADA prohibits disability discrimination by employers.  42 U.S.C. § 12112(a). Disability discrimination includes failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship."  *Id.* § 12112(b)(5)(A).  Claims under the ADA and the Rehabilitation Act are decided using the same substantive standards.  *Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 758 (10th Cir. 2020).

To establish a prima facie case of failure to accommodate by reassignment, Plaintiff must show (1) that he was disabled within the meaning of the ADA and he told Stormont Vail about his limitations; (2) that he cannot be reasonably accommodated within his current job; (3) that he requested a reasonable accommodation by reassignment to a vacant position which Plaintiff either identified or which would have been identified during the interactive process, in which Plaintiff in good faith cooperated; (4) Plaintiff was qualified to perform a vacant job with or without reasonable accommodations that was available at Stormont Vail at or around the time Plaintiff requested reassignment; and (5) Plaintiff was injured because he was not reassigned. *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 674–75 (10th Cir. 2021). If Plaintiff can make this prima facie showing, the burden shifts to Stormont Vail to either (1) conclusively rebut one or more elements of the prima facie case or (2) establish an affirmative defense. *Id.* at 674. Both parties have an obligation to engage in the interactive process in good faith, and one party cannot create or destroy liability by causing a breakdown in the interactive process. *Norwood v. United Parcel Serv., Inc.*, Case No. 19-2496-DDC-JPO, 2021 WL 3022315, at *11 (D. Kan. July 16, 2021).

The parties agree that the first two elements are not at issue. (Doc. 47 at 13; Doc. 50 at 24.) Plaintiff contends that genuine disputes of material fact exist as to the remaining elements. (Doc. 50 at 24.) Naturally, Defendant disagrees. (Doc. 47 at 13.) The court will address each position separately.

### 1. *Reassignment to Outpatient Position*

Plaintiff contends that although he could no longer serve as a hospitalist, he was still able to work as an outpatient physician with reasonable accommodations. (Doc. 50 at 25.) Defendant argues that Plaintiff caused a breakdown of the interactive process by failing to get an updated evaluation and by failing to provide Defendant with adverse medical information. (Doc. 47 at 13.)

10

Further, Defendant argues that Plaintiff posed a direct threat to patients and that his proposed accommodations were not reasonable and caused an undue burden.  (*Id.* at 18–26.)

Plaintiff suggests that he could have worked as an outpatient primary care physician had he been paired up with another physician, an APRN, or a PA to oversee the care he provided. During the interactive process, Dr. Dishman requested that Plaintiff obtain an updated evaluation from Acumen to guide Stormont Vail in assessing what Plaintiff could do and what accommodations were necessary.  Plaintiff refused to do so, believing that the evaluation Plaintiff had previously obtained from Acumen was sufficient.  Defendant contends that this refusal to obtain an updated evaluation caused a breakdown in the interactive process.

Looking at the facts from Plaintiff's perspective, Plaintiff had already received an evaluation from Acumen as he was directed to by Stormont Vail.  Plaintiff had also provided a release which allowed Stormont Vail to review his other medical records.  Additionally, Plaintiff visited Dr. Mathew to obtain his recommendations for a return to work.  Dr. Mathew could not provide those recommendations and instead recommended that Plaintiff return to Acumen. Plaintiff made a good faith effort to provide Defendant with the information it needed about his medical condition.  His refusal to obtain another updated evaluation did not cause a breakdown in the interactive process where Plaintiff had complied with all of Defendant's previous requests and provided full access to his medical records.  Further, Defendant and Plaintiff continued engaging in the interactive process well after Plaintiff failed to get the updated evaluation which suggests that the process had not broken down.

Defendant next contends that Plaintiff caused a breakdown in the interactive process when he failed to provide Stormont Vail with adverse medical information.[5]  Plaintiff obtained updated

---

[5] In its reply, Defendant admits that it is uncontroverted that Plaintiff executed a release of his medical records at KU and linked his KU medical records to his Stormont Vail medical records.  (Doc. 54 at 3.)  Defendant also appears to

11

testing from his treating doctor at KU, Dr. Townley, in August 2021 which indicated that Plaintiff now had two biomarkers consistent with Lewy body disease.  Plaintiff had previously signed a release which allowed doctors at Stormont Vail to view his medical records from KU.  Stormont Vail argues that it did not know about the results of these tests until litigation began and that Plaintiff's failure to provide the records caused a breakdown in the interactive process.  The court disagrees.  Because Plaintiff had released his records to Stormont Vail, construing the facts in the light most favorable to Plaintiff, Defendant had access to these records while the interactive process was ongoing.  Thus, this cannot have caused a breakdown in the interactive process.

Defendant argues that Plaintiff could not perform as an outpatient physician because he posed a direct threat to patient safety.[6]  Plaintiff had been diagnosed with Lewy body dementia and with Mild Neurocognitive Disorder.  In August 2021, tests showed that Plaintiff had two biomarkers which were consistent with Lewy body dementia.  Doctors who worked with Plaintiff reported concerns about his charting and his failure to create and follow treatment plans for patients.  Patients complained (informally) about the care Plaintiff provided.  Plaintiff was unable to complete administrative tasks and his work had steadily declined in quality.  Plaintiff himself testified that if he made a mistake or an omission it could harm a patient or even cause the patient's death.

The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. §§ 12111(3); 12113(a)–(b) ("The term 'qualification standards' may include a requirement that an individual shall not pose a direct

---

abandon its argument that the failure to provide these records caused a breakdown in the interactive process.  Nevertheless, the court addresses the argument here.

[6] Defendant also makes the argument that Plaintiff was not qualified to work as an outpatient physician because he did not have outpatient privileges.  (Doc. 47 at 19.)  The facts related to when a candidate applies for privileges (either before or after an offer of employment) are controverted.  *See supra* n. 3.  The court need not address this argument or the disputed facts because the court concludes that even if Plaintiff had outpatient privileges, he still could not perform the position with or without reasonable accommodations.

threat to the health or safety of other individuals in the workplace."). "The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r). Factors to consider include: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." *Id.* "In evaluating an employer's direct-threat contention, the fact-finder does not independently assess whether it believes that the employee posed a direct threat. [Rather], the fact-finder's role is to determine whether the employer's decision was objectively reasonable." *Rohr v. Union Pac. R.R. Co.*, Case No. 19-1114-JTM, 2020 WL 5802079, at *16 (D. Kan. Sept. 29, 2020) (quoting *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007)).

The court concludes that Defendant's decision that Plaintiff posed a direct threat to patients was objectively reasonable. A mistake by Plaintiff could have put a patient in imminent danger or even caused a patient's death, as Plaintiff admitted. It is clear that Plaintiff posed a direct threat to patients if he was responsible for patient care. *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 295 (7th Cir. 2015) ("It seems less reasonable to require SAHC to knowingly allow a psychologist with a documented memory impairment – whose immediate memory scored in the lowest two percent of the comparable population – to treat patients without meaningful supervision at an acute-care facility. . . . We do not mean to suggest that concern for patient safety or fear of malpractice liability relieved SAHC of the obligation to seriously engage in the interactive process – it did not, as we have said – but we do think it is entirely proper for an employer assessing the reasonableness of a proposed accommodation to consider the sensitive nature of the employee's position and the potential safety and liability risks involved.").

13

A related question is whether there is a reasonable accommodation that exists which could eliminate the direct threat to patient safety. Plaintiff contends that he could be accommodated by being supervised or paired up with an APRN or PA. Defendant contends that this is not a reasonable accommodation and instead it imposes an undue burden upon Defendant because of the licensing issues with having a non-peer work alongside Plaintiff and because the cost of hiring such a person would be exorbitant.

Undue hardship means "an action requiring significant difficulty or expense" and is to be considered in light of several factors. 42 U.S.C. § 12111(10)(A). The factors are:

> (i)    the nature and cost of the accommodation needed under this chapter;
>
> (ii)    the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii)    the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv)    the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

*Id.* § 12111(10)(B). The factors to be considered for undue hardship under the regulations are substantially the same, but also add an additional factor for the "impact of the accommodation

14

upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business." 29 C.F.R. § 1630.2(p)(v).

As mentioned above, it would cost Stormont Vail between $112,050.00 and $225,432.00 to hire an APRN or PA to do this type of work. To hire a hospitalist or outpatient physician to work with Plaintiff, it would cost Stormont Vail between $458,625.00 and $1,473,958.00. There is no evidence in the record before the court as to Defendant's financial resources, number of people employed, or the impact of this accommodation on Defendant's operations.

Although the court is without evidence to consider many of the factors, the court finds that the first factor decides the issue. The nature of this accommodation is not reasonable because it likely requires Defendant to engage in illegal conduct, having an APRN or PA engaging in the unlicensed practice of medicine while they supervise a physician. K.S.A. 65-2803(a); K.S.A. 65-2869; K.S.A. 65-28a08; K.S.A. 65-1130. On the contrary, Kansas law appears to require that the physician supervise the physician assistant, not the other way around. *See* K.S.A. 65-28a08(a); *see also* K.S.A. 65-2872(m) (indicating nurses do not practice medicine). Defendant is not obligated to make an accommodation which would violate the law.

Further, the cost of this accommodation is not reasonable. If Stormont Vail could hire an APRN or PA to supervise Plaintiff and work alongside him (and as stated before, legally, it cannot), it would cost Defendant between $112,050.00 and $225,432.00. Even without information to consider the overall financials of the institution, this is an excessive cost. If Stormont Vail were to hire another physician to supervise Plaintiff (which is a more legally sound option in terms of licensing), it would cost Defendant between $458,625.00 and $1,473,958.00. Again, this is a tremendously burdensome cost. This requested accommodation is both an undue burden and unreasonable.

15

### 2. *Reassignment to Administrative Position*

If Plaintiff could not be reassigned to an outpatient physician position, he also argues that he could have been accommodated by reassignment to an administrative position which would not require patient care.  (Doc. 50 at 23–26.)  Plaintiff contends that he was qualified without accommodations to work in several administrative positions available at Stormont Vail.  (*Id.* at 26.)  Defendant contends that Plaintiff caused a breakdown in the interactive process by abandoning discussions of reassignment to an administrative position.  (Doc. 47 at 17–18.) Plaintiff responds that he would have accepted an administrative position at any point in the process and points to several jobs that were open between April and October of 2021 that he believes he was qualified to perform.  (Doc. 50 at 19–20.)  Defendant argues that the uncontroverted facts show that Plaintiff abandoned any request for reassignment to an administrative position and that he cannot now rehabilitate himself by saying he would have accepted an administrative position.  (Doc. 54 at 7, 9–10.)  Additionally, Defendant argues that Plaintiff cannot show he was qualified to perform any of the open administrative positions.  (*Id.* at 13–14.)

As explained above, reassignment to a vacant position can be a reasonable accommodation in certain situations.  *Herrmann*, 21 F.4th at 674–75.  Plaintiff must make a showing of his prima facie case, including that he engaged in discussions with his employer in good faith to identify a position he was qualified to perform, with or without accommodations.  *Id.*  Plaintiff cannot make this showing.

The uncontroverted facts show that Plaintiff engaged in the interactive process primarily through his attorney during the late spring and summer of 2021.  In June 2021, Plaintiff requested reassignment to an administrative position.  Defendant responded and requested to set up a

16

conference call between the parties and attorneys to discuss Plaintiff's qualifications and the positions available. That conference call never occurred, and Plaintiff did not again ask about reassignment to an administrative position. In fact, Plaintiff requested (through his attorney) reassignment to an outpatient position or a monetary payment in September 2021, just before the mediation. The facts show that Plaintiff stopped pursuing a reassignment to an administrative position.

Plaintiff attempts to rehabilitate his claim by providing an affidavit indicating that he "would have accepted reassignment to any of the vacant administrative positions . . . because [his] long-term disability benefits will expire in September of 2023, and because [his] pension and social security benefits would not have been affected." (Doc. 51 at 27.) Yet in summer of 2021, Plaintiff did not have a conference call with Defendant and did not further inquire about vacant administrative positions. And when Defendant presented a door screener position as a potential option to Plaintiff at the mediation in September 2021, he did not accept that position. Plaintiff cannot now argue that he pursued reassignment to an administrative position in good faith when he completely abandoned that accommodation during the interactive process.

Because Plaintiff cannot show that he engaged in the interactive process regarding this potential accommodation in good faith, he cannot make prima facie showing of failure to accommodate as to reassignment to an administrative position.

### B. Retaliation

As to Plaintiff's retaliation claim, Plaintiff argues that he engaged in protected activity when he requested a reasonable accommodation and filed a charge of discrimination and was retaliated against for engaging in that protected activity. (Doc. 45 at 12.) Specifically, Plaintiff alleges that he was retaliated against when Defendant did not grant him a reasonable

accommodation and when Defendant terminated his employment. (*Id.*) The court addressed Plaintiff's concerns about reasonable accommodations above and will not address them further. *Johnson v. Norton Cnty. Hosp.*, 550 F. Supp. 3d 937, 961 (D. Kan. 2021) ("Plaintiff also asserts in the pretrial order that defendant retaliated against her for requesting an accommodation by 'putting her on a rigid schedule that did not accommodate her needs' and 'reducing her full-time position to a part-time schedule.' But these allegations are superfluous in light of her failure-to-accommodate claim.").

Plaintiff alleges he was terminated from his employment in retaliation for requesting reasonable accommodations and for filing an administrative charge. (Doc. 45 at 12.) Plaintiff also notes that his termination occurred on the same date as the mediation which took place during the administrative phase of this case before the lawsuit was filed. (Doc. 50 at 28.) Defendant contends that Plaintiff has waived the argument that he was terminated in retaliation for his participation in the mediation because he did not include that argument or any facts to support it in the pretrial order. (Doc. 54 at 14.) Defendant also argues that Plaintiff's argument (that the reasons Defendant provided for Plaintiff's termination were pretextual) is waived or in the alternative, fails. (*Id.* at 14–15.)

Plaintiff filed his charge of discrimination on July 1, 2021. Individuals at Stormont Vail learned the charge had been filed sometime on or before July 9, 2021. Mediation for the charge took place on September 15, 2021. In between the time the charge was filed and when mediation was held, Plaintiff and Defendant's attorneys were in communication trying to negotiate a resolution. At mediation, the parties discussed potential reassignment to a door screener position, but Plaintiff refused that reassignment. The parties also discussed Plaintiff's employment status and whether he would continue to be employed. Ultimately, Defendant elected to terminate

Plaintiff's employment effective September 15, 2021, because (1) Plaintiff "had not maintained privileges, (2) he had not provided full-time professional services [f]or almost a year, (3) he had not provided on-call services for almost a year, and (4) his disability prevented him from performing the duties detailed in his employment contract."  (Doc. 47 at 28.)

To make a prima facie case of retaliation under the ADA, Plaintiff must show that (1) he engaged in protected activity; (2) a reasonable employee would find the action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action.  *Winston v. Ross*, 725 F. App'x 659, 664 (10th Cir. 2018) (citing *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011)).  If Plaintiff can establish a prima facie case, then Defendant can rebut it by showing a legitimate nondiscriminatory reason for the adverse action.  *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).  Then the burden shifts back to Plaintiff to show that the stated reason is mere pretext.  *Id.*

The first element requires Plaintiff to show he engaged in protected activity.  There is no dispute that Plaintiff engaged in protected activity when he filed his charge of discrimination. Defendant argues that Plaintiff cannot rely specifically on his participation in the mediation on September 15 as protected activity because he did not make that allegation in the pretrial order. (Doc. 54 at 14; Doc. 45.)  Plaintiff argues that his participation in a "specific litigation activity" on the exact date his termination was effective shows temporal proximity which suggests causation. (Doc. 50 at 29.)  Plaintiff cites *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir. 2002), for the proposition that Plaintiff's participation in mediation constitutes "specific litigation activity."  In *Hysten*, the court explained:

> We intimate no opinion regarding this contention [that the retaliatory action occurred 6 days after the specific litigation activity] except to say that the proximity between a specific litigation activity and the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to have been

19

aware of the specific activity. . . . Plaintiff does not make this showing, and thus,
we agree that summary judgment is appropriate.

*Id.* While it is true that Plaintiff participated in specific litigation activity, the mediation, on the

same day his termination was effective, Defendant correctly notes that Plaintiff did not identify

"participation in mediation" as protected activity in the pretrial order. (*See* Doc. 45 at 12.) The

pretrial order controls the litigation from the time it is entered going forward. *Wilson v. Muckala*,

303 F.3d 1207, 1215–16 (10th Cir. 2002); *see also* Fed. R. Civ. P. 16(d). Thus, Plaintiff cannot

rely on his participation in mediation alone as establishing temporal proximity.

Plaintiff preserved his argument that the filing of the charge was a protected activity and

that there is close temporal proximity between the filing of the charge and his termination. (*See*

Doc. 45 at 12.) To reiterate, Plaintiff filed his charge of discrimination on July 1, 2021, and his

termination was effective September 15, 2021, approximately a two and a half month time gap

between the protected activity and the adverse action. A temporal proximity of one and a half

months has been found to be close enough in time to show causation. *Fisher v. Basehor-Linwood*

*Unified Sch. Dist. No. 458*, 460 F. Supp. 3d 1167, 1205–06 (D. Kan. 2020), *aff'd*, 851 F. App'x

828 (10th Cir. 2021) ("The Tenth Circuit has held that a one and one-half month period – about

the same interval here between plaintiff filing her EEOC Charge and her job termination – may,

by itself, establish causation.") (internal quotation omitted). But three months between the

protected activity and the adverse employment action has been determined to be not close enough.

*Winston v. Ross*, 725 F. App'x 659, 665 (10th Cir. 2018) (citing *Piercy v. Maketa*, 480 F.3d 1192,

1198 (10th Cir. 2007)). The court assumes without deciding that two and a half months is close

enough to show causation, as it determines below that Plaintiff fails to show pretext.

Defendant argues that Plaintiff has waived his right to argue that Defendant's reasons were

mere pretext because Plaintiff did not argue pretext in the pretrial order and did not include any of

20

the facts he relies on to show pretext in the pretrial order. (Doc. 54 at 14.) Defendant asserted that it had legitimate non-discriminatory business reasons for Plaintiff's termination in the defenses it listed in the pretrial order. (Doc. 45 at 13.) Plaintiff did not include any of the facts necessary to form his pretext argument or indicate that he intended to make a pretext argument in the pretrial order, so he is making that argument for the first time in his response to Defendant's motion for summary judgment.

"Claims, issues, defenses, or theories of damages not included in the pretrial order are waived." *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)). While pretrial orders are intended to be liberally construed, "the primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.'" *Id.* (quoting *Cortez*, 460 F.3d at 1276). Here, Defendant faces unfair surprise at Plaintiff's pretext argument. To be fair, Defendant likely could have or should have anticipated that Plaintiff would make a pretext argument in light of Defendant's defense that it had legitimate business reasons for terminating Plaintiff.[7] But without Plaintiff identifying the facts he relies on for pretext, Defendant was caught by surprise as to the specifics of this argument. Plaintiff reasonably should have known at the time of drafting the pretrial order that he would make a pretext argument, particularly in light of the fact that Defendant identified its legitimate business reasons for the termination as a defense in the pretrial order. Plaintiff cannot now make an argument not made in the pretrial order supported by facts not identified in the pretrial order. The court determines that the pretext argument fails because it was not disclosed. Accordingly,

---

[7] Plaintiff included facts related to his pretext arguments in the Amended Complaint, which likely gave Defendant notice of this argument. (*See* Doc. 23 at 12–13.) But the pretrial order controls, and Defendant could have reasonably understood that Plaintiff was abandoning his claims of pretext. *Wilson v. Muckala*, 303 F.3d 1207, 1215–16 (10th Cir. 2002).

because Defendant has shown legitimate, non-discriminatory reasons for Plaintiff's termination and because Plaintiff has not shown pretext, Plaintiff's retaliation claim fails.

### C. Unlawful Termination

Plaintiff argues that he was intentionally discriminated against because of his disability when Defendant terminated his employment. (Doc. 45 at 12.) Defendant contends that Plaintiff was not qualified to do his job and that his disability prevented him from performing his duties with or without an accommodation. (Doc. 47 at 29.) Plaintiff relies on the pretext argument from the retaliation section above as sufficient to raise a genuine dispute of fact. (Doc. 50 at 30–31.)

Plaintiff must make a showing of the following elements to survive summary judgment: (1) he was disabled; (2) he was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) he was terminated because of his disability. *Hermann*, 21 F.4th at 678. As the court concluded in its analysis related to the failure to accommodate claim, Plaintiff is not qualified to perform the essential functions of his job as a hospitalist because he poses a direct threat to patients. Plaintiff even conceded he could no longer work as a hospitalist. And even if Plaintiff could make the prima facie showing required, Defendant has asserted legitimate, non-discriminatory business reasons for the termination and Plaintiff has waived his pretext argument. Accordingly, the court concludes that Plaintiff's unlawful termination claim fails.

### D. Breach of Contract

Plaintiff contends that Defendant violated his employment contract by failing to reasonably accommodate his disability and by terminating him. (Doc. 45 at 12.) This claim is redundant of Plaintiff's claims for failure to accommodate and for unlawful termination. The employment contract required Defendant to abide by the ADA and the RA and to reasonably accommodate

Plaintiff if possible.  Because the legal analysis is substantially the same for this claim as for the claims above, the court need not address this claim further.  Plaintiff's breach of contract claim fails.

**IV.      Conclusion**

For the above reasons, Defendant's motion for summary judgment (Doc. 46) is GRANTED.

IT IS SO ORDERED this 9th day of June, 2023.


___s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE

23

# United States District Court

-------------------------- DISTRICT OF KANSAS---------------------------

**JEFFREY P. RHOADS, M.D.,**

**Plaintiff,**

**v.**                                    **Case No: 22-4005-JWB**

**STORMONT VAIL HEALTHCARE, INC.**

**Defendant,**

## JUDGMENT IN A CIVIL CASE

☐     Jury Verdict.   This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒     Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that pursuant to the Memorandum and Order filed June 9, 2023, Defendant's motion for summary judgment (Doc. 46) is GRANTED.

_____June 9, 2023_____              SKYLER B. O'HARA
          Date                          CLERK OF THE DISTRICT COURT

                                        by:  __s/ Joyce Roach_____
                                               Deputy Clerk