Appeal No. 23-3125

## United States Court of Appeals for the Tenth Circuit

Jeffery P. Rhoads, M.D.,
*Plaintiff – Appellant,*

v.

Stormont-Vail Healthcare, Inc.,
*Defendant – Appellee.*

Appeal from the United States District Court for the District of Kansas
District Court Case No. 5:22-CV-04005-JWB-ADM
The Honorable John W. Broomes Presiding

## Brief of Appellee
## Stormont-Vail Healthcare, Inc.

## Oral Argument Not Requested

Susan L. Mauch, KS #15295
Goodell, Stratton, Edmonds & Palmer LLP
515 S. Kansas Ave.
Topeka, Kansas 66603
Phone: (785) 233-0593
slmauch@gseplaw.com
Attorneys of Defendant-Appellee
Stormont-Vail Healthcare, Inc.

# TABLE OF CONTENTS

Statement of Related Cases ...................................................................... 1

Statement of the Issue ............................................................................... 1

Statement of the Case ............................................................................... 1

Statement of Facts ..................................................................................... 2

    A.   Rhoads' Cognitive Failure and Restriction of Rhoads' Privileges . 3

    B.   Dr. Kevin Dishman and Rhoads' Employment ............................. 7

    C.   Interactive Process ...................................................................... 10

Summary of the Argument ...................................................................... 14

Argument and Authorities ...................................................................... 15

    I.   Standard of Review .................................................................... 15

    II.  The District Court Properly Granted Summary Judgment on Rhoads' Failure-to-Accommodate Claim .......................................... 177

      A.   Stormont did not violate the ADA or RA when it did not reassign Rhoads to an outpatient physician position ................................... 19

        1.  Rhoads failed to cooperate in the interactive process in good faith. ......................................................................................... 19

          *a.*   *Rhoads refused to obtain an updated diagnostic impression.* 21

          *b.*   *Rhoads failed to provide updated adverse medical information* .............................................................................. 25

        2.  Rhoads was not qualified to practice as an outpatient physician. ................................................................................. 26

          *a.*   *Rhoads did not have outpatient privileges, nor was he going to apply for them* ...................................................................... 27

*b.    Stormont reasonably believed Rhoads posed a direct threat to patient safety, which could not be eliminated by reasonable accommodation.*..........................................................................28

*c.    Rhoads has not proposed a facially reasonable accommodation*..........................................................................35

3.    Rhoads' requested accommodations would have imposed an undue hardship on Stormont.......................................................41

B.    Stormont did not violate the ADA or RA when it did not reassign Rhoads to an administrative position...............................................43

1.    Rhoads abandoned his request for an administrative position during the interactive process.....................................................43

2.    Rhoads cannot identify an administrative job for which he was qualified and which was available around the time he requested reassignment....................................................................46

C.    Rhoads cannot demonstrate injury...........................................48

III. The District Court's Order Stands With Respect to Rhoads' Additional Claims ....................................................................49

Conclusion ..........................................................................50

Certificate of Compliance with Type-Volume Limit............................51

Certificate of Service ...........................................................52

<u>TABLE OF AUTHORITIES</u>

## Cases

*Aubrey v. Koppes*, 975 F.3d 995 (10th Cir. 2020)........................ 20, 43, 44

*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869 (10th Cir. 2004) ................ 47

*Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284 (10th Cir. 2000)... 28

*Butler v. Daimler Trucks North America, LLC*, 74 F.4th 1131 (10th Cir. 2023) .................................................................................. 15

*Carter v. Union Pac. R.R. Co.*, No. 20-2093-DDC, 2022 WL 1909049 (D. Kan. June 3, 2022) .............................................................. 33

*Chan v. Sprint Corp.*, 351 F. Supp. 2d 1197 (D. Kan. 2005) ................. 35

*City of Colorado Springs v. Solis*, 589 F.3d 1121 (10th Cir. 2009) ........ 50

*Donahue v. Consolidated Rail Corp.*, 224 F.3d 226 (3d Cir. 2000) ........ 48

*Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217 (10th Cir. 2008).......... 16

*Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255 (10th Cir. 2009) .......... 35

*Herrmann v. Salt Lake City Corp.*, 21 F.4th 666 (10th Cir. 2021)...17, 19, 27, 44, 46, 49

*Jarvis v. Potter*, 500 F.3d 1113 (10th Cir. 2007)............................... 29, 31

*Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080 (10th Cir. 2008) . 29, 34

*Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018)..................... 27

*Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114 (10th Cir. 2004).......... 47

*McKenzie v. Benton*, 388 F.3d 1342  (10th Cir. 2004)............................ 29

*Milton v. Scrivner, Inc.*, 53 F.3d 1118 (10th Cir. 1995).................... 35, 40

*Norwood v. United Parcel Serv., Inc.*, No. 19-2496-DDC-JPO, 2021 WL 3022315 (D. Kan. July 16, 2021) ....................................................... 21

*Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260 (10th Cir. 2015)...35, 41

*Provstgaard v. IHC Health Servs., Inc.*, No. 2:14-CV-00117-RJS, 2016 WL 6108545 (D. Utah Oct. 19, 2016) ........................................................30

*Reigel v. Kaiser Found. Health Plan of N. Carolina*, 859 F. Supp. 963 (E.D.N.C. 1994) ...................................................................................38

*Richison v. Ernest Group, Inc.*, 634 F.3d 1123 (10th Cir. 2011) ......16, 19

*Robertson v. Neuromedical Ctr.*, 161 F.3d 292 (5th Cir. 1998) ........30, 35

*Rohr v. Union Pac. R.R. Co.*, No. 19-1114-JTM, 2020 WL 5802079 (D. Kan. Sept. 29, 2020).............................................................................29

*Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ....................................................................................................16

*Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, (10th Cir. 1999)...................................................................................20, 25

*Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276 (7th Cir. 2015) ....30, 36

*Stern v. St. Anthony's Health Ctr.*, No. 12-CV-785-SCW, 2013 WL 5967746 (S.D. Ill. Nov. 8, 2013)..........................................................38

*Sullivan v. Univ. of Kansas Hosp. Auth.*, 844 F. App'x 43 (10th Cir. 2021) ....................................................................................................17

*Templeton v. Neodata Servs., Inc.*, 162 F.3d 617 (10th Cir. 1998)...21, 25

*United Parcel Serv., Inc.*, No. 19-2496-DDC-JPO, 2021 WL 3022315 (D. Kan. July 16, 2021).............................................................................21

*Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136 (10th Cir. 2013) .........16

*Webster v. Methodist Occupational Health Centers, Inc.*, 141 F.3d 1236 (7th Cir. 1998)...................................................................................38

*Weigel v. Target Stores,* 122 F.3d 461 (7th Cir. 1997) ...........................36

## Statutes

18 U.S.C. § 1001 ........................................................................ 43

18 U.S.C. § 1341 ........................................................................ 43

18 U.S.C. § 287 ......................................................................... 43

29 C.F.R. § 1630 ........................................................... 28, 29, 34

29 U.S.C. §§ 701 ........................................................................ 2

42 U.S.C. § 12111 .......................................... 17, 29, 41, 42

42 U.S.C. § 12113 ............................................................ 15, 28

42 U.S.C. §§ 12101 ................................................................... 2

K.S.A. 65-1113 ......................................................................... 40

K.S.A. 65-2803 ......................................................................... 39

K.S.A. 65-2869 ......................................................................... 39

K.S.A. 65-28a08 ....................................................................... 39

## Other Authorities

*EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act*, 2002 WL 31994335 ....................................................... 20, 24, 40

*Enforcement Guidance: Disability-related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA)*, 2000 WL 33407181 .................................................. 21

Fed. R. App. P. 32 .................................................................... 51

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF THE ISSUE

1.    Did the district court properly grant summary judgment on Rhoads' failure-to-accommodate claim?

## STATEMENT OF THE CASE

In late 2020, Dr. Jeffrey Rhoads ("Rhoads")[1] began showing signs of cognitive failure while employed as a hospitalist by Stormont-Vail Healthcare, Inc. ("Stormont"). Hospital staff and patients expressed concerns about the quality of Rhoads' care. In early 2021, multiple health care providers diagnosed Rhoads with neurocognitive impairment and suspected he had early Lewy body dementia. Stormont determined that allowing Rhoads to continue practicing medicine would risk patient safety and ultimately terminated his employment. After filing a charge with the Kansas Human Rights Commission and Equal Employment Opportunity Commission, Rhoads commenced this action on January 19, 2022, alleging four claims under the Americans with Disabilities Act, 42

---

[1] Due to the number of physicians mentioned in this brief, the designation "Dr." is reserved for (a) the introduction of each respective doctor and (b) repeatedly for Rhoads' treating and evaluating physicians.

U.S.C. §§ 12101, et seq. (the "ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, et seq. (the "RA") and his contract: (1) failure-to-accommodate, (2) unlawful retaliation, (3) unlawful employment termination, and (4) breach of contract. Stormont moved for summary judgment on all four claims. The district court granted Stormont's motion in its entirety, and Rhoads timely appealed the district court's ruling on his failure-to-accommodate claim.

## STATEMENT OF FACTS

Stormont is a not-for-profit health care system based in Topeka, Kansas, which includes the Stormont-Vail Hospital and Cotton O'Neil clinics. (App. Vol. 1 at 41; Vol. 2 at 449, p. 6).[2] Rhoads is a physician that specializes in internal medicine. (App. Vol. 1 at 41). While employed by Stormont, Rhoads practiced as a hospitalist under the terms of a Physician Employment Agreement dated October 1, 2019 ("the Agreement"). (App. Vol. 1 at 41; at 91–111).[3] The essential functions and duties of physicians, whether inpatient or outpatient, include providing

---

[2] References to the Appellant's Appendix ("App.") and the Appellee's Supplemental Appendix ("Supp. App.") are to the volume number and page number.

[3] The parties stipulated to the foundation and authenticity of all records produced in discovery. (App. Vol. 1 at 43).

2

medical care to patients that meets the appropriate standard of care, independently exercising professional judgment regarding the care and treatment of patients, creating and recommending appropriate and specific treatment plans, accurately recording a patient's medical history, accurately updating patient information and charting with sufficient detail, leading and coordinating care for patients, and performing administrative tasks. (App. Vol. 1 at 92–94, §§ 1.1, 2.1, 2.3, 2.6; at 114–115, ¶3).

## A. Rhoads' Cognitive Failure and Restriction of Rhoads' Privileges

Stormont's Medical Staff has the duties of peer review, credentialing, quality and patient safety. (App. Vol. 1 at 200–201). All physicians practicing at Stormont, whether employed by Stormont or not, must be granted privileges in accordance with the Medical Staff's Credentials Policy. (App. Vol. 1 at 202, 219). At all times relevant to this suit, Dr. Kimberly Brey ("Brey") was the President of Stormont's Medical Staff. (App. Vol. 1 at 200). Dr. Traci Cuevas ("Cuevas") and Dr. Jason Austin ("Austin") were co-medical directors of the adult hospitalist group. (App. Vol. 1 at 228).

On November 9, 2020, Cuevas called Brey to report concerns within the hospitalist group that Rhoads was exhibiting signs of dementia and to ask Brey what to do next. (App. Vol. 1 at 204, 205, 229, 230–231). Cuevas and Austin had concerns about Rhoads that included misinformation in his charting, failure to provide specific treatment plans for patients, complaints from patients about substandard care, inability to complete simple administrative tasks, issues with his orientation, and other general concerns about his steady decline in the quality of his work. (App. Vol. 1 at 204, 205, 230–231, 235–236).

Per Medical Staff policy, Brey formed an ad hoc Physicians' Health and Advocacy Subcommittee ("the Committee") to discuss the hospitalists' concerns about Rhoads. (App. Vol. 1 at 205, 230–231, 268–272). After review, the Committee recommended precautionary restriction of Rhoads' clinical privileges until he could be evaluated and the Committee received  the evaluation report. (App. Vol. 1 at 205, 230–232). The Committee referred Rhoads to Acumen Assessments, Inc. ("Acumen") for a comprehensive evaluation of his cognitive abilities and suggested a possible neurological evaluation. (App. Vol. 1 at 117, 205,

230-232). Ultimately Rhoads' last shift as a hospitalist at Stormont was November 24, 2020. (App. Vol. 1 at 41).

Rhoads was evaluated from January 4 to January 7, 2021, at Acumen by a team including a psychiatrist and four licensed psychologists. (App. Vol. 1 at 117–118). In its report dated January 8, 2021, the team diagnosed Rhoads with Mild Neurocognitive Disorder, noting "Mild to moderate impairment across multiple domains on standardized neuropsychological testing." (App. Vol. 1 at 125). It concluded that (1) Rhoads "cannot be considered fit to practice medicine at this time" and (2) he likely could not return to work as a hospitalist and recommended further neurological evaluation and imaging studies. (App. Vol. 1 at 125, 240, 241). On January 11, 2021, Rhoads took FMLA leave from his employment as a hospitalist and, on January 12, 2021, took a voluntary leave of absence from his membership and privileges with the Medical Staff. (App. Vol. 1 at 41–42).

Based on Rhoads' follow-up neurological evaluations and imaging studies in early 2021, multiple health care professionals confirmed Rhoads was suffering from cognitive impairment and suspected he was in the early stages of Lewy body dementia. (App. Vol. 1 at 128–129, 131,

133–134, 137, 144, 148–149, 160–161). On January 27, 2021, Dr. Hartej Sethi stated that "imaging studies do point towards Lewy body dementia as the underlying pathology" and that it was "unlikely he will ever be in a position to practice medicine again." (App. Vol. 1 at 134). In February, Dr. Ryan Townley, Rhoads' neurologist at the University of Kansas Health System, concluded that Cuevas and Austin's concerns about Rhoads' work performance "would be consistent with his difficulties on our detailed cognitive testing with executive function and working memory related tasks that require set shifting." (App. Vol. 1 at 161).

Because Rhoads' medical records indicated he could no longer work as a hospitalist, Brey recommended to Rhoads that he withdraw his hospitalist privileges. (App. Vol. 1 at 207). Brey told Rhoads that given his current neurological status, if Rhoads chose not to withdraw his privileges, the Committee would likely limit or suspend his privileges, which would be reportable to the Kansas Board of Healing Arts. (App. Vol. 1 at 207-208, 211-212, 274). At Rhoads' request, the Committee never met again to decide about Rhoads' privileges; Rhoads wanted to wait until the end of his one-year leave of absence to see if he improved. (App. Vol. 1 at 242, 277).

Rhoads understood that a mistake or omission by him in a patient record could cause harm to a patient or their death. (App. Vol. 1 at 244, 245). Rhoads did not reapply for hospitalist privileges by August 31, 2021, which was the end of his appointment period. (App. Vol. 1 at 282, 283). Per Medical Staff policy, "[i]f an individual's current appointment is due to expire during the leave [of absence], the individual's appointment and clinical privileges will expire at the end of the appointment period, and the individual will be required to apply for reappointment." (App. Vol. 1 at 225). The Medical Staff treated the expiration of Rhoads' privileges as a voluntary withdrawal, as it would in any situation when a practitioner does not submit his reappointment application. (App. Vol. 1 at 282, 283). Rhoads never applied for outpatient physician privileges because he was afraid that he would be denied, be reported to the Board of Healing Arts, and be in worse shape than he already was. (App. Vol. 1 at 206, 243).

## B. Dr. Kevin Dishman and Rhoads' Employment

Medical Staff's credentialing and privileging procedures for physicians are separate and distinct from Stormont's physician-employment practices. (App. Vol. 1 at 239, 287). Dr. Kevin Dishman

7

("Dishman") is Stormont's Chief Medical Officer and is responsible for hiring physicians. (App. Vol. 1 at 286; Vol. 2 at 306). He was the decision maker in this case concerning Rhoads' employment. (App. Vol. 1 at 291, 292, 294). The Medical Staff and the Committee's evaluation of Rhoads' privileges was independent of Dishman's evaluation of Rhoads' employment, and Rhoads understood this distinction. (App. Vol. 1 at 239, 295).

Dishman knew that there were concerns over Rhoads' ability to safely practice and knew he was on leave from the medical staff and FMLA leave for a time. (App. Vol. 1 at 288, 290). After Rhoads' FMLA leave expired in April 2021, it was Dishman's intention that Rhoads return to practice when it was safe for him to do so. (App. Vol. 1 at 246, 288, 290). Dishman explained to Rhoads that, regardless of what job he had at Stormont, he had to be capable of performing that job. (App. Vol. 1 at 289, 290).

In April 2021, Dishman asked Rhoads to complete a fitness for duty assessment with Dr. Mathew, director of Occupational Health. (App. Vol. 1 at 298, 300, 314). Because Dishman was responsible for patient safety, Dishman needed to know specifically (i) what Rhoads could do, (ii) how

his disability would impact his performance, and (iii) how he could minimize any risk to patient safety, before agreeing to Rhoads' employment at Stormont. (App. Vol. 1 at 296, 298-300; Vol. 2 at 301). Dishman was not trained in "determining how to accommodate a physician," and none of Rhoads' medical records provided to Stormont at that point included specific recommendations that would guide Dishman's ability to assess what Rhoads could or could not do. (App. Vol. 1 at 300; Vol. 2 at 301, 303-304). Dishman believed Dr. Mathew could assist in formulating a specific plan for Rhoads' return to Stormont. (App. Vol. 2 at 311). Rhoads agreed to the evaluation by Dr. Mathew, which occurred on May 20, 2021. (Supp. App. at 15-16).

After Dr. Mathew evaluated Rhoads and reviewed his recent medical records, Dr. Mathew recommended that Acumen perform an updated diagnostic impression and give specific recommendations concerning Rhoads' ability to return to work, including specific recommendations about work restrictions, workload demands, Rhoads' ability to perform his essential job duties, hours per day and days per week restrictions, supervision and oversight specifications, and frequency of monitoring. (Supp. App. at 16). Dr. Mathew recommended

that Acumen review Dr. Townley's recent notes and confer with Dr. Townley, to formulate a plan for Rhoads' return to work. (Supp. App. at 16). Rhoads initially agreed to a re-evaluation by Acumen, and Acumen agreed to schedule a follow up with Rhoads after he signed a release of information. (Supp. App. at 13, 16). Around May 21, 2021, Dishman offered Rhoads two weeks of pay to complete the evaluation per Dr. Mathew's recommendation and work with Dishman to develop a practical solution. (App. Vol. 2 at 108, 302).  Rhoads declined Dishman's offer. (App. Vol. 2 at 320).

## C. Interactive Process

After May 27, 2021, Rhoads and Stormont engaged in the interactive process required by the ADA through their respective attorneys, Alan Johnson ("Johnson") and Timothy Shultz ("Shultz"). (App. Vol. 1 at 42;[4] Vol. 2 at 321–359[5]). Johnson admitted that Rhoads

---

[4] The parties stipulated to the admissibility of the correspondence between Johnson and Shultz for purposes of summary judgment. (App. Vol. 1 at 42–43).
[5] Johnson's September 14, 2021, letter contains names and alleged impairments of other physicians that he argued posed direct threats to patient safety. As discovery proceeded, it was clear that these physicians were not "similarly situated." Rhoads abandoned the theory and did not preserve this argument in the Pretrial Order. (App. Vol. 1 at 43-46). Out of respect for the privacy of those individual physicians and to further preserve any peer review and/or risk management privilege under Kansas statutes, names and alleged impairments were redacted from the letter. (Supp. App. at 3).

could not return to his position as a hospitalist, but believed he could return as an outpatient physician or in an administrative position and requested this accommodation. (App. Vol. 2 at 330-331, 365). However, Dr. Townley, KU, and Acumen's records up to May 2021 lacked specifics as to Rhoads' limitations and a specific plan that would in all practicality allow Dishman to determine that Stormont could employ Rhoads while maintaining patient safety. (App. Vol. 2 at 302-304).

In addition to the lack of a specific plan for Rhoads' return to practice at Stormont, Dishman, in consultation with Shultz, determined that Stormont could not reassign Rhoads to an outpatient physician position for several reasons: (1) Rhoads' medical records indicated that his degenerative mental condition persisted, and he could likely not perform the essential functions of a physician; (2) Rhoads was not likely to be granted privileges for an outpatient position given his condition and the privileging committee's historically conservative approach to privileging; (3) hiring a full-time mid-level practitioner to oversee Rhoads was not a reasonable accommodation and posed an undue burden on Stormont; and (4) Rhoads' condition could endanger patients even with oversight from a mid-level practitioner. (App. Vol. 2 at 344-347, 307, 308).

The salary range with benefits for an advanced practice registered nurse ("APRN") employee at Stormont's hospitalist or outpatient departments is $112,050.00 to $225,432.00. (App. Vol. 2 at 375, ¶ 3). The salary range with benefits for a physician assistant ("PA") at Stormont's hospitalist or outpatient departments is $112,050.00 to $225,432.00. (App. Vol. 2 at 375, ¶ 4). The salary range with benefits for a hospitalist or outpatient physician employee in those departments is $458,625.00 to $1,473,958.00. (App. Vol. 2 at 376, ¶ 5).

Rhoads—through Johnson—also requested reassignment to an administrative position. (App. Vol. 2 at 322–323, 331, 364-365). Rhoads told Brey that he wanted to be the best paid copy boy ever. (App. Vol. 1 at 251-252, 276). Many of Stormont's job postings require specific certifications and licensures to be qualified to perform in certain positions. (App. Vol. 2 at 385-386). After Shultz cautioned Johnson about how reassignment to such a position would decrease Rhoads' income and, in turn, decrease his long-term disability benefits, Rhoads did not further pursue this potential reassignment. (App. Vol. 1 at 250, 252-254, 263-266; Vol. 2 at 327, 346-347, 358-359).

Rhoads did not apply for any administrative positions. (App. Vol. 1 at 250). Because of Rhoads' disability, he qualified for social security, long term disability, and pension benefits of $7,000 per month. (App. Vol. 1 at 246-249; App. Vol. 2 at 389-390). Any vacant administrative position for which Rhoads was qualified would have paid him less than $7,000 per month. (App. Vol. 2 at 376).

In June or July, 2021, Rhoads reached out to Dr. Townley for clarification on his condition and disability by performing additional testing. (App. Vol. 1 at 255). On August 27, 2021, Dr. Townley told Rhoads that he now had two objective biomarkers highly consistent with the working diagnosis of nonamnestic mild cognitive impairment due to suspected Lewy body disease. (App. Vol. 1 at 172-173). These include the FDG-PET scan and the CSF synuclein test. (App. Vol. 1 at 173). Rhoads failed to provide this information to Stormont during the interactive process. (App. Vol. 1 at 258-259). Rhoads testified in his deposition that it was too bad for Stormont that it did not know about it because it could have been used against him. (App. Vol. 1 at 256-259).

On October 13, 2021, Dishman (through Shultz) informed Rhoads that Stormont had separated with Rhoads on September 15, 2021,

because he breached his employment contract. (App. Vol. 2 at 392-395). Specifically, (1) Rhoads had not maintained privileges, (2) he had not provided full-time professional services for almost a year, (3) he had not provided on-call services for almost a year, and (4) his disability prevented him from performing the duties detailed in his employment contract. (App. Vol. 1 at 115, 383-384, 387; App. Vol. 2 at 392-395).

## SUMMARY OF THE ARGUMENT

The district court properly granted summary judgment on Rhoads' failure-to-accommodate claims. Rhoads suggests Stormont should have reassigned him to an outpatient physician position. However, in light of Rhoads' neurocognitive impairment, early Lewy body dementia, and providers' statements that Rhoads was unfit to return to practice, Stormont reasonably believed employing Rhoads as a physician would pose a direct threat to patient safety. Stormont cannot operate hoping its employee physician with dementia does not injure a patient. Though Rhoads argues any threat he would pose as a physician would be eliminated if he were supervised by other health care providers, such an accommodation would contravene Rhoads' essential duties as an

14

independent provider, be financially burdensome on Stormont, and likely be unlawful oversight of a physician by a PA or APRN.

Rhoads also suggests Stormont could have reassigned him to an administrative position. But Rhoads stopped pursuing an administrative position during the interactive process and never identified or applied for an open position for which he was qualified. Nor was it reasonable for Stormont to pay Rhoads a hospitalist salary to be the "best paid copy boy ever," as he put it. Accordingly, Rhoads fails to show that the district court erred in granting Stormont summary judgment on his failure-to-accommodate claim.

## ARGUMENT AND AUTHORITIES

## I.    Standard of Review

This Court reviews the district court's grant of summary judgment de novo, applying the same legal standards used by the district court. *Butler v. Daimler Trucks North America, LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023). Thus, summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). The Court is to view the evidence, and draw all reasonable inferences, in favor of the nonmoving party. *Id.*

15

A dispute as to a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).

There are three important caveats to this Court's standard of review. First, although review is de novo, this Court reviews the case from the perspective of the district court at the time it ruled, and it ordinarily limits its review to the materials that the parties adequately brought to the attention of the court. *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008). Second, when the record blatantly contradicts a party's version of events so that no reasonable jury could believe it, a court should not adopt that party's version of the facts when ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Third, this Court may affirm the district court's ruling on "any basis supported by the record," even if the basis was not reached by the district court or presented on appeal. *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

## II.   The District Court Properly Granted Summary Judgment on Rhoads' Failure-to-Accommodate Claim.

The district court properly granted summary judgment on Rhoads' failure-to-accommodate claim. Rhoads has only brought failure-to-accommodate by *reassignment* claims. (App. Vol. 1 at 51). Where, as here, an employee brings failure-to-accommodate claims under both the ADA and RA, the claims may properly be analyzed together because the elements of the claims are substantially the same. *See Sullivan v. Univ. of Kansas Hosp. Auth.*, 844 F. App'x 43, 48 (10th Cir. 2021). Reassignment to a vacant position is a possible reasonable accommodation under the ADA. 42 U.S.C. § 12111(9). In the summary judgment context, this Court employs a unique two-step burden shifting framework to analyze an employee's failure-to-accommodate by reassignment claim. *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 674–75 (10th Cir. 2021). The employee bears the initial burden of establishing a prima facie case by showing the following:

(1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer;

(2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished[;]

17

(3) The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate;

(4) The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and

(5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

*Id.* If the employee establishes all five elements of a prima face case, the burden then shifts to the employer to either (1) conclusively rebut one or more elements of plaintiff's prima facie case or (2) establish an affirmative defense. *Id.* at 674.

As the district court correctly noted, the first two elements of Rhoads' prima facie case are not in issue. (App. Vol. 2 at 506). The parties agree that Rhoads has at all relevant times been disabled within the meaning of the ADA, and that Rhoads was not able to serve in his preferred position as a hospitalist (App. Vol. 1 at 51, 241). The parties disagree on the third and fourth elements with respect to Rhoads' request

for an outpatient physician position, and the third, fourth, and fifth elements with respect to Rhoads' request for an administrative position.

## A. Stormont did not violate the ADA or RA when it did not reassign Rhoads to an outpatient physician position.

The uncontroverted evidence shows Rhoads failed to cooperate in the interactive process when he refused to allow an assessment of his fitness to practice as an outpatient physician. And as the district court concluded, not only would Rhoads pose a "direct threat" to patient safety if employed as an outpatient physician, which threat could not reasonably be accommodated, but Stormont also established the proposed accommodations would impose an undue burden.

### 1. Rhoads failed to cooperate in the interactive process in good faith.

Though the district court concluded Rhoads sufficiently showed he cooperated in the interactive process in good faith, this Court may properly affirm the district court's decision on the grounds that Rhoads has not established this third element. *See Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). "Once an employee requests reassignment as an accommodation, both the employee and employer have an obligation to engage in an interactive process." *Herrmann*, 21

F.4th at 674. Both parties must "proceed in a reasonably interactive manner" to determine whether the employee would be qualified, with or without reasonable accommodation, for another job within the company. *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999). The employee must communicate in good faith because the employee often possesses information relevant to the employer's determination about whether he can perform the essential functions of a position and what accommodations, if any, would be necessary. *Aubrey v. Koppes*, 975 F.3d 995, 1007 (10th Cir. 2020).

An employee's obligation to communicate with the employer in good faith can include providing medical information. The EEOC's enforcement guidelines state:

> An employer may require that the documentation about the disability and the functional limitations come from an appropriate health care or rehabilitation professional. The appropriate professional in any particular situation will depend on the disability and the type of functional limitation it imposes. Appropriate professionals include, but are not limited to, doctors (including psychiatrists), psychologists, nurses, physical therapists, occupational therapists, speech therapists, vocational rehabilitation specialists, and licensed mental health professionals.

*EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act*, 2002 WL 31994335,

at *6. An employee's failure to provide necessary medical information may preclude him from claiming that the employer unlawfully failed to provide a reasonable accommodation or offer reassignment. *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998); *Norwood v. United Parcel Serv., Inc.*, No. 19-2496-DDC-JPO, 2021 WL 3022315, at *22 (D. Kan. July 16, 2021). The EEOC's guidance also states that "the ADA does not prevent an employer from requiring an employee to go to an appropriate health care professional of the employer's choice if the employee provides insufficient documentation from his/her treating physician (or other health care professional) to substantiate that s/he has an ADA disability and needs a reasonable accommodation." *Enforcement Guidance: Disability-related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA)*, 2000 WL 33407181, at *11. Documentation might be insufficient if it "does not specify the functional limitations due to the disability." *Id.*

### a. Rhoads refused to obtain an updated diagnostic impression.

First, Rhoads failed to cooperate in the interactive process in good faith when he refused to obtain an updated diagnostic impression upon Stormont's request. After Rhoads' FMLA leave expired around April of

2021, Dishman, Stormont's Chief Medical Officer responsible for hiring physicians, intended for Rhoads to return to practice at Stormont when safe to do so. (App. Vol. 1 at 246, 288, 290). As Dishman was also responsible for patient safety, he needed to know specifically (i) what Rhoads could do, (ii) how his disability would impact his performance, and (iii) how he could minimize any risk to patient safety, before agreeing to Rhoads' employment at Stormont. (App. Vol. 1 at 296, 298-300; Vol. 2 at 301). But Dishman was not trained in "determining how to accommodate a physician," and none of Rhoads' medical records at that point included recommendations that would guide Dishman's ability to assess what Rhoads could or could not do. (App. Vol. 1 at 300; Vol. 2 at 301, 303-304). Accordingly, Dishman agreed with Dr. Mathew's recommendation to obtain an updated evaluation from Acumen, the expert in the area, so they could "develop a specific practical plan" for how to proceed. (App. Vol. 1 at 300; Vol. 2 at 301). Around May 21, 2021, Dishman offered Rhoads two weeks of pay to complete the evaluation and work with Dishman to develop a practical solution. (App. Vol. 2 at 108, 302). Rhoads declined Dishman's offer and refused to obtain the updated evaluation. (App. Vol. 2 at 320).

Rhoads has noted that Acumen's updated evaluation had been completed on April 12, 2021. (App. Vol. 2 at 427-428). But Acumen's April 12 report did not provide a specific plan, which Dishman needed to ensure Rhoads could safely practice in an outpatient setting. (App. Vol. 2 at 303-304, 478). Moreover, Acumen's April 12 report could not have considered Lindsey Gillen's May 10, 2021 visit notes (an APRN in Dr. Townley's office) that changed Rhoads' work status. (Supp. App. at 15). It was reasonable for Stormont to want Acumen to take these recent notes into account when forming its updated recommendation. And regardless of whether Rhoads and Brey believed Acumen's evaluation had been "completed," Acumen agreed to provide another evaluation per Dr. Mathew's recommendation. (Supp. App. at 13).

Rhoads also insists that because Dishman never personally reviewed any Acumen report, somehow this raises a disputed factual issue as to whether Rhoads participated in the interactive process in good faith. (App. Vol. 2 at 428). Stormont fails to see how this conclusion follows, and in any event Dishman did not need to personally review Acumen's reports to be familiar with their contents or otherwise reasonably rely on Dr. Mathew's recommendations. (App. Vol. 2 at 301).

23

Hence, there is no genuine dispute that Rhoads refused to comply with Stormont's request for an updated evaluation. And because Stormont had the right to require Rhoads to provide an updated report specifying his work limitations before reassigning him, Rhoads failed to cooperate in the interactive process in good faith.

The district court concluded that Rhoads' refusal to obtain an updated evaluation "did not cause a breakdown in the interactive process" because (1) Rhoads had complied with all of Stormont's previous requests and (2) the parties "continued engaging in the interactive process well after [Rhoads] failed to get the updated evaluation which suggest that the process had not broken down. (App. Vol. 2 at 507). An employee is not merely obligated to "not cause a breakdown of the interactive process" but to "cooperate in the interactive process in good faith." As explained above, such good faith cooperation may include the employee providing medical information reasonably requested by the employer. *See EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act*, 2002 WL 31994335, at \*6. Hence, when Dishman requested an evaluation by Acumen in light of Dr. Mathew's report, Rhoads' duty to cooperate in the

24

interactive process in good faith was not satisfied simply because he had cooperated up to that point. Stormont reasonably required an additional evaluation, to which Rhoads refused to submit.

### b. Rhoads failed to provide updated adverse medical information.

Second, Rhoads refused to cooperate in good faith in the interactive process when he failed to communicate in good faith and provide pertinent medical information to Stormont. *See Smith*, 180 F.3d at 1172. An employee withholding pertinent information to the employer's accommodation decision may be found to have obstructed the process. *Templeton*, 162 F.3d at 619. However, while the interactive process was still ongoing, Rhoads failed to inform Stormont that tests ordered by Dr. Townley detected misfolded protein aggregates of alpha synuclein, which is the protein found in diseases such as Parkinson's disease, multiple system atrophy, and Lewy body disease. (App. Vol. 1 at 258-259).

The district court reasoned that because Stormont could access the adverse test results via a release Rhoads signed, Rhoads could not have caused a breakdown in the interactive process. (App. Vol. 2 at 508). But the district court incorrectly determined that all good faith required of Rhoads was to provide Stormont *access* to the test results. However,

access is not the same thing as good faith communication. Good faith communication required Rhoads to ensure Stormont was aware of test results, which Rhoads understood to be relevant to a possible reassignment. In fact, Johnson had previously provided Shultz with medical records and updates on Rhoads' condition in their interactive process discussions. (App. Vol. 2 at 330-342). Rhoads agreed that he sought out additional testing for clarification of his condition and disability *after* he refused Stormont's request that he be reevaluated. (App. Vol. 1 at 255). He further stated that it was too bad for Stormont that it did not know about the test results because it could have been used against him even while he continued to advocate for reassignment as an outpatient physician. (App. Vol. 1 at 256-259). These uncontroverted facts demonstrate Rhoads' bad faith in the interactive process.

### 2. Rhoads was not qualified to practice as an outpatient physician.

To establish the fourth element of a prima facie case of failure-to-accommodate, an employee must show they were "qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company" and that an appropriate vacant position

was "available within the company at or about the time the request for reassignment was made." *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 674–75 (10th Cir. 2021). Employees may show they are qualified for a vacant position if they (1) have "the requisite skill, experience, education and other job-related requirements" and (2) could perform the "essential functions" of the position. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018). Rhoads has failed to make either showing.

### a. Rhoads did not have outpatient privileges, nor was he going to apply for them.

First, Rhoads was not qualified for an outpatient physician position because he did not have outpatient privileges and was not going to apply for them. All physicians, whether employed by Stormont or not, must be granted privileges to practice medicine at its hospital and clinics in accordance with the Medical Staff's Credentials Policy. (App. Vol. 1 at 202, 219). To practice as an outpatient physician at one of its clinics, a physician must go through the credentials and privileging process with the *clinic's* Medical Staff. (App. Vol. 1 at 209, 240, 243). Rhoads never applied for outpatient physician privileges at Stormont because he was afraid that he would be denied, be reported to the Board of Healing Arts, and be in worse shape than he already was. (App. Vol. 1 at 243).

27

The district court did not fully address Stormont's argument that Rhoads was unqualified due to lack of outpatient privileges. It merely stated that the facts related to "when a candidate applies for privileges (either before or after an offer of employment) are controverted." (App. Vol. 2 at 508). However, regardless of when a candidate seeks medical staff privileges, Rhoads' refusal to apply for privileges demonstrates that he was unqualified for an outpatient physician position even if he was offered one.

### b. *Stormont reasonably believed Rhoads posed a direct threat to patient safety, which could not be eliminated by reasonable accommodation*.

Secondly, Rhoads cannot show he could perform the essential functions of an outpatient physician because Stormont reasonably believed he posed a direct threat to patient safety. "The ADA does not require employers to take unnecessary risks when dealing with a mentally or physically impaired employee in an inherently dangerous job." *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1295 (10th Cir. 2000). A disabled individual is unqualified for a position if he poses a direct threat to the health or safety of other individuals in the workplace. 42 U.S.C. § 12113(a)-(b); 29 C.F.R. § 1630.2(r); 29 C.F.R. § 1630.15(b)(2).

A "direct threat" is "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The EEOC's regulations point the factfinder to four factors to consider whether an employee poses a direct threat: (1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm. 29 C.F.R. § 1630.2(r); *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1091 (10th Cir. 2008).

Because being a physician necessarily implicates the safety of others, the burden is on Rhoads to show that he could perform the essential functions of a physician without endangering others. *See Justice* at 1091; *see* also *McKenzie v. Benton*, 388 F.3d 1342, 1353-56 (10th Cir. 2004) (discussing who bears the burden to show *direct threat*). Importantly, the direct-threat inquiry is whether the employer's *determination* that the employee posed a direct threat was objectively reasonable. *Rohr v. Union Pac. R.R. Co.*, No. 19-1114-JTM, 2020 WL 5802079, at *16 (D. Kan. Sept. 29, 2020) (quoting *Jarvis v. Potter*, 500 F.3d 1113, 1122 [10th Cir. 2007]).

There are numerous cases in which a court has found that a health care provider posed a direct threat to patient safety because of an impairment. For example, in *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 296 (5th Cir. 1998), the court found that a neurologist with attention deficit hyperactivity disorder, which interfered with his ability to complete charts and interpret tests, posed a direct threat to his patients and that "any accommodations . . . would be unjustified from the standpoint of the basic medical safety of [his] patients." Similarly, in *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 295 (7th Cir. 2015), the court affirmed summary judgment in favor of a hospital that terminated its chief psychologist whose memory deficiencies prevented him from performing the essential functions of his job. The court emphasized the risk to patient safety and said, "The ADA does not require an employer to walk "on a razor's edge—in jeopardy of violating the [ADA] if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone." 788 F.3d at 295. And, in *Provstgaard v. IHC Health Servs., Inc.*, No. 2:14-CV-00117-RJS, 2016 WL 6108545, at *8-12 (D. Utah Oct. 19, 2016), the court granted a hospital summary judgment because an echocardiograph technician could not perform the essential

functions of his job after he suffered a stroke and thereafter experienced short-term memory loss and started making frequent, major mistakes in his work that sometimes put patients at risk.

As these cases demonstrate, Stormont was justified in determining that Rhoads posed a direct threat to patient safety in any physician position and that nothing required it to risk patient safety by reassigning Rhoads to an outpatient physician position. The uncontroverted facts establish that Dishman had a legitimate and reasonable concern about patient safety based upon Rhoads' confirmed neurocognitive impairment and suspected Lewy body dementia, which was later confirmed. *See Jarvis*, 500 F.3d at 1123 (recognizing that a health-care professional defendant is presumably a person better trained to assess dangerousness than a typical employer).

In November 2020, Rhoads' colleagues expressed concerns about Rhoads that included misinformation in his charting, failure to provide specific treatment plans for patients, complaints from patients about substandard care, inability to complete simple administrative tasks, and issues with his orientation. (App. Vol. 1 at 204-205, 230–231, 235–236). In early 2021, multiple healthcare providers confirmed Rhoads'

neurocognitive impairment and suspected Lewy body dementia. (App. Vol. 1 at 128–129, 131, 133–134, 137, 144, 148–149, 160–161). Those providers opined that Rhoads was unfit to practice medicine, and Rhoads himself testified that a mistake by him in a patient record could cause harm to a patient or their death. (App. Vol. 1 at 125, 134, 244-245).

This is not a close call. As the district court concluded, Stormont's determination that Rhoads posed a direct threat to patient safety was objectively reasonable as it "is clear that Plaintiff posed a direct threat to patients if he was responsible for patient care." (App. Vol. 2 at 509). Moreover, Rhoads conceded that he would pose a direct threat to patient safety if his disability were not accommodated, as is apparent from Johnson's June 23, 2021, letter. (App. Vol. 2 at 330). There, Johnson pointed to Dr. Townley's April 14, 2021, progress note that suggested that Rhoads may be able to return to outpatient medicine (1) if donepezil could help his attention and information encoding and (2) if he worked "closely with a nurse practitioner/PA and/or someone overseeing documentation/treatment plans to make sure he is performing well would be recommended." (App. Vol. 2 at 330). Rhoads and Johnson understood

that there were concerns with Rhoads' ability to practice safely, hence the request for accommodations.

Rhoads argues that a reasonable jury could find that Stormont's direct-threat determination was not objectively reasonable based upon seven "factors." These so-called factors, however, do not demonstrate that Rhoads could perform the essential functions of a physician without endangering others. *Carter v. Union Pac. R.R. Co.*, No. 20-2093-DDC, 2022 WL 1909049, at *15-20 (D. Kan. June 3, 2022) (summary judgment granted because Plaintiff had no evidence that would create triable issue about whether his employer's direct threat determination was unreasonable). Dishman's actions demonstrate that Stormont's determination was objectively reasonable. He was familiar with the contents of Acumen's reports and deliberately sought the advice of experts to determine Rhoads' fitness to return to work because he was not trained in the area. (App. Vol. 2 at 301-302).

Rhoads' argument does not help him meet his burden of showing that (1) the duration of the risk was so short, (2) the nature and severity of the potential harm was so small, (3) the likelihood that the potential harm would occur was so low, and (4) that imminence of the potential

harm was so doubtful that Stormont's "direct-threat" determination was unreasonable. *See* 29 C.F.R. § 1630.2(r); *Justice*, 527 F.3d at 1091.

Even if certain providers believed Rhoads could continue practicing safely in some type of supervised setting, Stormont could not ignore Rhoads' medical records confirming he was a direct threat to patient safety and that he should not be a physician. In January 2021, Dr. Sethi told Rhoads that he would be unlikely to practice medicine again. (App. Vol. 1 at 134). Dr. Townley's notes—which Dr. Mathew reviewed—tied Rhoads' disability to Cuevas and Austin's concerns about Rhoads' (1) misinformation in his charting, (2) failure to provide specific treatment plans for patients, (3) complaints from patients about substandard care, (4) inability to complete simple administrative tasks, (5) issues with his orientation, and (6) the steady decline in the quality of his work. (App. Vol. 1 at 157-161, 204-205, 230–231, 235–236; Supp. App. at 15-16). In other words, (1) the duration of the risk was *long*, (2) the nature and severity of the potential harm was *great*, (3) the likelihood that the potential harm would occur was *high*, and (4) that imminence of the potential harm was *actualized*. Rhoads has not shown Stormont's belief that he posed a direct threat to patient safety was unreasonable.

### c. Rhoads has not proposed a facially reasonable accommodation.

Rhoads carries the burden to demonstrate the existence of a facially reasonable accommodation. *See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009). Stormont was not required to provide Rhoads' ideal accommodation, but only an accommodation that was reasonable in terms of costs and benefits. *See Chan v. Sprint Corp.*, 351 F. Supp. 2d 1197, 1207 (D. Kan. 2005). When an employee's accommodation must alleviate health and safety concerns, the employee must show the accommodation "would eliminate significant risk." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1269–70 (10th Cir. 2015). In addition, an accommodation is not facially reasonable if it requires an employer to relieve the employee of an essential function of a job, modify the actual duties, reassign existing employees, or hire new employees to perform those duties. *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995).

To begin, nothing in the record suggests Rhoads' proposed accommodation would have sufficiently mitigated the risk that Rhoads would cause significant harm to a patient. Neither report that Johnson cited in his June 23, 2021, letter assuaged Stormont's concerns about

Rhoads' threat to patient safety. (App. Vol. 2 at 330-331). APRN Gillen's May 10, 2021, visit note cited by Johnson did not address patient safety and did not rebut earlier findings concerning Rhoads' medical condition. (App. Vol. 2 at 302-304, 333-339).  It was not altogether clear either. The APRN's note could be read as releasing him to work in a position that everyone agreed he could not safely perform. Dr. Townley's April 14, 2021, progress note was also insufficient. Its recommendation was based on the achievement of several conditions, such as Rhoads responding well to donepezil, whether he was receptive to feedback, and whether his condition did not worsen. (App. Vol. 2 at 332). There is nothing medically definitive—or even reassuring—in these records that Rhoads could practice safely. *See Weigel v. Target Stores,* 122 F.3d 461, 469 (7th Cir. 1997) (statement from a medical professional stating that "there was a good chance" that an employee could return to work with treatment was too conclusory and uninformative to be given any weight).

Because of the lack of definitiveness in Rhoads' medical records concerning his fitness to practice medicine, putting Rhoads back to work as an outpatient physician—even with an accommodation—would require Stormont to walk on a razor's edge. *Stern*, 788 F.3d at 295. The

ultimate question is: would patients feel safe or that they were receiving quality care from a physician who had been diagnosed with Mild Cognitive Disorder and early-stage Lewy body dementia? Nothing Rhoads has presented would allow Stormont to answer "yes."

Second, Rhoads' proposed accommodations would relieve him of the essential duties of a physician. A physician must be able to *independently* exercise professional judgment regarding the care and treatment of patients, accurately document patient medical history and treatment plans, and perform administrative tasks. (App. Vol. 1 at 92–94, §§ 1.1, 2.1, 2.3, 2.6; at 114–115, ¶3). Rhoads' request relieves him of these essential duties and pawns them off to another employee. Even when viewed in the light most favorable to Rhoads, Acumen's recommended accommodation would require Rhoads' judgment to be overseen by another health care provider and be "observed throughout the workday by a defined group of coworkers/nurses." (App. Vol. 2 at 478).

There are many examples from the medical field where a court has rejected such a request. *See, e.g., Robertson*, 161 F.3d at 295 (rejecting request to hire administrative assistant for neurologist with ADHD or transfer his administrative duties to an assistant); *Webster v. Methodist*

37

*Occupational Health Centers, Inc.*, 141 F.3d 1236, 1238 (7th Cir. 1998) (health center not required to have a full-time nurse-escort who could guide plaintiff or take over for her if her disability prevented her from taking proper care of a patient); *Stern v. St. Anthony's Health Ctr.*, No. 12-CV-785-SCW, 2013 WL 5967746, at *5 (S.D. Ill. Nov. 8, 2013) (clinical psychologist with short term memory loss who required increased supervision was not qualified for that position); *Reigel v. Kaiser Found. Health Plan of N. Carolina*, 859 F. Supp. 963, 973 (E.D.N.C. 1994) (medical group's duty to accommodate did not require it to restrict doctor's duties to supervision and administration or to assign physician full-time assistant). Requiring Stormont to hire or reassign a physician, mid-level practitioner, nurse, or anyone else to oversee Rhoads' work is facially unreasonable.

Rhoads contends his proposed accommodation would merely amount to a "reinitiation" of Stormont's proctoring process. But Rhoads' requested accommodation is not the same thing as the Medical Staff's proctoring program. Rhoads' request includes (1) oversight of his clinical decision-making and documentation by an APRN, PA, or physician, and (2) observation throughout the day by a "defined group of

coworkers/nurses". (App. Vol. 2 at 330-339, 478). Importantly, this accommodation would also be indefinite. Neither Rhoads nor any provider proposed a terminal date for this accommodation, and Acumen noted the oversight would need to be "ongoing" and that Rhoads' condition "may well deteriorate." (App. Vol. 2 at 478).

The Medical Staff proctoring process is different from Rhoads' proposed accommodation in three key respects. First, the proctoring process is a *temporary* period for physicians upon their initial grant of privileges; it is not intended to be ongoing but last "the shortest amount possible," typically no more than one year. (App. Vol. 2 at 467-468). Second, while proctoring can involve "some back and forth" with the proctoring physician, the process primarily consists of documentation review by a peer physician and "is not technically oversight." (Supp. App. at 20, 26). Importantly, oversight is not something a PA or APRN could do for Rhoads, as such oversight would be unlawful under Kansas law. Only a licensed physician may practice medicine and surgery in Kansas. *See* K.S.A. 65-2803(a); K.S.A. 65-2869. Because PAs and APRNs are not licensed to independently practice medicine and surgery, physicians oversee PAs and APRNs, not the reverse. K.S.A. 65-28a08(a); K.S.A. 65-

1113(b)-(g). Third, the Medical Staff proctoring process is not designed for a physician with cognitive impairment—especially not one that "may well deteriorate and needs to be tracked with some frequency." (App. Vol. 2 at 478; Supp. App. at 21). Accordingly, Rhoads' request for an indefinite "buddy like system" would relieve him of his essential duties as a physician and misuse the Medical Staff proctoring process. (App. Vol. 2 at 443). *See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124-25 (10th Cir. 1995).

Finally, Rhoads' health care providers suggested he could only return to work under supervision once Rhoads began responding well to donepezil. (App. Vol. 2 at 332, 338). But an individual's personal decision to take or not take medicine is not an accommodation which an employer can grant. *See Robertson*, 161 F.3d at 296; *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, 2002 WL 31994335, at *26. Whether Rhoads took his donepezil—even if it did help him—was out of Stormont's control. This is not a facially reasonable accommodation either.

40

### 3. Rhoads' requested accommodations would have imposed an undue hardship on Stormont.

Not only is Rhoads' proposed accommodation unreasonable, but it would also pose an undue hardship on Stormont. *See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015). Two of the factors in considering whether an accommodation would impose an undue hardship are the nature and cost and the effect on expenses and resources. 42 U.S.C. § 12111(10)(B). Hiring a PA or APRN to oversee Rhoads' medical care would likely cost $112,050 to $225,432 a year. (App. Vol. 2 at 375, ¶ 3-4). Hiring a hospitalist or outpatient physician employee for the same purpose would cost $458,625 to $1,473,958. (App. Vol. 2 at 376, ¶ 5). As the district court concluded, even without considering Stormont's overall financial resources, hiring another provider to oversee Rhoads would be a "tremendously burdensome cost." (App. Vol. 2 at 511). Such resources are best used for direct patient care, rather than for indefinite supervision of Rhoads.

Rhoads contends that the evidence, when viewed most favorably to him, shows he merely proposed that Stormont reinstate the proctoring process for him. Rhoads argues that a reasonable jury could believe, based on Brey's testimony, that Stormont had previously reinstated the

proctoring process for Dr. Baraban ("Baraban"), and could likewise do so for Rhoads without undue hardship. But Brey did not provide any details regarding Baraban. (App. Vol. 2 at 469). There is no evidence that Baraban's condition was similar to that of Rhoads, or that the accommodations Stormont made for Baraban—if any—were not an undue hardship on Stormont. (App. Vol. 2 at 469). And as explained above, the Medical Staff proctoring process would not be applicable to Rhoads.

Rhoads also argues that Stormont's showing of undue burden is insufficient because it did not present evidence for many of the factors courts may consider in determining whether an undue burden exists. But Rhoads mistakes a factor test for an element test. 42 U.S.C. § 12111(10)(B) states that "[i]n determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include . . ." and lists many factors the Court may consider. Stormont need not show every factor, and this Court, like the district court, could properly find that "the first factor decides the issue." (App. Vol. 2 at 511).

42

Because Stormont has presented undue-hardship evidence, the burden shifts back to Rhoads to come forward with evidence to rebut Stormont's evidence. *See Aubrey v. Koppes*, 975 F.3d 995, 1006 (10th Cir. 2020). In rebuttal, the only thing Rhoads suggested was that both he and his supervising "buddy" bill out their time, which is a potentially fraudulent system of double billing. (App. Vol. 2 at 176-177, 431). *See, e.g.,* 18 U.S.C. § 1341; 18 U.S.C. § 287; 18 U.S.C. § 1001. Thus, he fails to present sufficient rebuttal evidence.

## B. Stormont did not violate the ADA or RA when it did not reassign Rhoads to an administrative position.

The district court correctly concluded that Rhoads "completely abandoned" his request to be reassigned to an administrative position. In addition, Rhoads cannot identify a vacant administrative position for which he was qualified, nor can he show he was injured as a result of Stormont's failure to reassign him.

### 1. Rhoads abandoned his request for an administrative position during the interactive process.

When an employee seeks accommodation by reassignment, the third element of the employee's prima facie case requires the employee to engage in discussions with the employer in good faith to identify a vacant

position they were qualified to perform. *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 674–75 (10th Cir. 2021). The employee cannot fault the employer for failing to reassign the employee to a position when the employee ceased pursuing that position. *See Aubrey v. Koppes*, 975 F.3d 995, 1008-09 (10th Cir. 2020) ("Neither party may create or destroy liability by causing a breakdown of the interactive process.").

Here, Rhoads engaged in the interactive process through his attorney, Johnson, in late spring and summer of 2021. (App. Vol. 1 at 42; Vol. 2 at 321–359). Rhoads first expressed interest in an administrative position as an alternative to an outpatient position in June 2021. (App. Vol. 2 at 322, 365). In response to this request, on July 2, Shultz "encourage[d] Dr. Rhoads to consider entering discussions with SVH about vacant positions that do not include doctor-patient relationships." (App. Vol. 2 at 344, 346-347). Shultz offered to schedule a conference call between the parties to discuss administrative positions. (App. Vol. 2 at 346-347). Rhoads did not respond to Shultz's offer. (App. Vol. 1 at 250, 252-254, 263-266; Vol. 2 at 327, 346-347, 358-359). Johnson's July 9, 2021, and August 3, 2021, follow-up emails and his September 14, 2021, letter do not include a request for reassignment to an administrative

44

position—but only a request for reassignment to an outpatient care position. (App. Vol. 2 at 349-359).

Rhoads contends that a reasonable jury could find that Rhoads did not abandon his request for an administrative position. First, he notes Johnson's June 23 request for reassignment to an administrative position and his July 9 proposal that the parties explore a resolution of "all of [Rhoads'] claims." These facts do not oppose Stormont's position, which is that Rhoads abandoned his pursuit of an administrative position after Shultz' July 2 letter. And Rhoads' proposal that the parties explore a resolution of "all of his claims" cannot reasonably be construed as pursuit of an administrative position at Stormont.

Second, Rhoads points to testimony from Stormont's Senior Vice President and Chief Experience Officer Darlene Stone ("Stone") regarding the September 15, 2021, mediation. But Stone's testimony only indicates that (1) Rhoads requested a position "in a capacity other than as a hospitalist" and (2) the parties discussed nonphysician positions such as a door screener. (App. Vol. 2 at 384-385, 474). There is no evidence that Rhoads pursued an administrative position during the mediation, especially when he rejected Stormont's offer of a nonphysician

position at the mediation. (App. Vol. 2 at 384-386). Accordingly, the district court correctly concluded that Rhoads "cannot show that he engaged in the interactive process regarding this potential accommodation in good faith." (App. Vol. 2 at 513).

### 2. Rhoads cannot identify an administrative job for which he was qualified and which was available around the time he requested reassignment.

Rhoads has failed to make a prima facie showing that an appropriate administrative position was available at the time he requested reassignment. Rhoads' contentions in the pretrial order fail to specifically identify an appropriate vacant position. (App. Vol. 1 at 43-46, 51). It is not Stormont's burden to identify a vacant position. *See Herrmann*, 21 F.4th at 675. Given that Rhoads has failed to identify a specific vacant position available at or about the time he requested reassignment in his pretrial contentions, the Court should affirm summary judgment for Stormont on any claim related to reassignment to an administrative position.

Not only did Rhoads fail to identify a specific vacant position in the pretrial order, but Rhoads also cannot show there was ever a vacant administrative position at Stormont *for which he was qualified*. It is

Rhoads' burden to present evidence of his qualifications, and he cannot rely on speculation, conjecture, or surmise. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Rhoads testified that he is unskilled in the administrative area. (Supp. App. at 34, 36). It is uncontroverted that his disability caused him "difficulties on our detailed cognitive testing with executive function and working memory related tasks that require set shifting" and that Cuevas and Austin's concerns regarding his cognitive abilities were valid. (App. Vol. 1 at 161, 204-205, 230–231, 235–236). Dr. Townley also believed that Rhoads' executive dysfunction "would be tested more vigorously in a demanding work setting." (App. Vol. 1 at 173). .

Although Rhoads self-servingly declares—without going into any specifics—that he was qualified "based on [his] education, training, and experience" for certain vacant positions, he does not provide evidence that he could perform their essential functions. (App. Vol. 2 at 462). *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1121-22 (10th Cir. 2004) (plaintiff's "own testimony that she could perform the essential functions of" her job was "self-serving" and "insufficient under Fed. R. Civ. P. 56(c)"). Hence, Rhoads fails to show how he could perform the essential

functions of the administrative positions he identifies with his current disability—especially one that affected his executive function and working memory. *See Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000) ([I]n a failure to transfer case, if, after a full opportunity for discovery, the "record is insufficient to establish the existence of an appropriate position into which plaintiff could have been transferred, summary judgment must be granted in favor of defendant even if it also appears that the defendant failed to engage in good faith in the interactive process." [emphasis added]).

## C. Rhoads cannot demonstrate injury.

Finally, Rhoads must carry the burden of the fifth element of his claim: that he suffered injury because Stormont did not offer to reassign him to an appropriate vacant position. As set forth above as to his requested position as an outpatient physician, Rhoads failed to cooperate in the interactive process in good faith and posed a direct threat to patient safety that could not be reasonably accommodated or that caused an undue burden. And, as also set forth above, Rhoads cannot demonstrate that he is qualified for any administrative position. In other

words, there was no "appropriate vacant position" to which Stormont failed to assign him.

Moreover, as a result of Rhoads' disability, he qualified for social security, long term disability, and pension benefits of $7,000 per month. (App. Vol. 1 at 246-249; App. Vol. 2 at 389-390). Rhoads seeks to create a genuine issue of material fact by citing his self-serving declaration that his "pension and social security benefits would not have been affected" if he had accepted an administrative position. (App. Vol. 2 at 463). But any vacant position for which Rhoads was qualified would have paid him under $7,000 per month. (App. Vol. 2 at 376). As Rhoads himself realized, reassignment to such a position would have only hurt him financially and so he dropped the request. (App. Vol. 1 at 250, 252-254, 263-266; Vol. 2 at 327, 346-347, 358-359). Accordingly, Rhoads has failed to demonstrate that Stormont's decision to not reassign him to either an outpatient physician position or administrative position caused him to suffer an injury. *See Herrmann*, 21 F.4th at 675.

## III. The District Court's Order Stands With Respect to Rhoads' Additional Claims.

Finally, it should be noted that the district court's order with respect to Rhoads' retaliation, unlawful termination, and breach of

contract claims stands. "[A]rguments not raised in the opening brief are waived." *City of Colorado Springs v. Solis*, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009). In this case, the district court granted summary judgment on all of Rhoads' claims: failure-to-accommodate, retaliation, unlawful termination, and breach of contract. (App. Vol. 2 at 505, 519). Because Rhoads has only addressed his failure-to-accommodate claim in his opening brief, this Court should conclude that Rhoads waived any arguments with respect to the other claims, and that the district court's order with respect to those claims stands.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order granting summary judgment in its entirety.

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,133 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font and Century Schoolbook.

Date: October 5, 2023.

*/s/ Susan L. Mauch*
Susan L. Mauch, KS #15295
Goodell, Stratton, Edmonds & Palmer LLP
515 S. Kansas Ave.
Topeka, Kansas 66603
Phone: (785) 233-0593
slmauch@gseplaw.com
Attorneys of Defendant-Appellee
Stormont-Vail Healthcare, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2023, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

Alan V. Johnson
ajohnson@sloanlawfirm.com

/s/ Susan L. Mauch
Susan L. Mauch, KS #15295
Goodell, Stratton, Edmonds & Palmer LLP
515 S. Kansas Ave.
Topeka, Kansas 66603
Phone: (785) 233-0593
slmauch@gseplaw.com
Attorneys of Defendant-Appellee Stormont-Vail Healthcare, Inc.